# ILLINOIS OFFICIAL REPORTS

## Supreme Court

*City of Chicago v. StubHub, Inc.*, 2011 IL 111127

| | |
|---|---|
| Caption in Supreme Court: | THE CITY OF CHICAGO, Appellant, v. STUBHUB, INC., Appellee. |
| Docket No. | 111127 |
| Filed<br>Modified Upon Denial<br>of Rehearing | October 6, 2011<br><br>November 26, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Illinois municipalities may not require electronic intermediaries, such as an internet auction listing service, to collect and remit city amusement taxes on resold tickets—certified question. |
| Decision Under Review | Certified question from the United States Court of Appeals for the Seventh Circuit; heard in that court on appeal from the United States District Court for the Northern District of Illinois, the Hon. Wayne R. Andersen, Judge, presiding. |
| Judgment | Certified question answered. |

Counsel on Appeal

Mara S. Georges and Stephen R. Patton, Corporation Counsel, of Chicago (Benna Ruth Solomon, Myriam Zreczny Kasper and Julian N. Henriques, Jr., of counsel), for appellant.

Roger H. Bickel, Michael J. Kelly and Jill C. Anderson, of Freeborn & Peters LLP, and Stephen M. Shapiro, Michele L. Odorizzi, Timothy S. Bishop and James V. Hart, of Mayer Brown LLP, all of Chicago, for appellee.

Anita Alvarez, State's Attorney, of Chicago (Patrick T. Driscoll, Jr., Paul A. Castiglione, Jeffrey S. McCutchan and James S. Beligratis, Assistant State's Attorneys, of counsel), for *amicus curiae* County of Cook.

Constantine L. Trela, Jr., and Bruce Braverman, of Sidley Austin, LLP, of Chicago, for *amici curiae* Ebay Inc. and The Netchoice Coalition.

Justices

JUSTICE THEIS delivered the judgment of the court, with opinion.

Justices Freeman, Garman, and Burke concurred in the judgment and opinion.

Justice Thomas dissented upon denial of rehearing, with opinion, joined by Chief Justice Kilbride and Justice Karmeier.

**OPINION**

¶ 1     This case comes before us on certification from the United States Court of Appeals for the Seventh Circuit. See Ill. S. Ct. R. 20 (eff. August 1, 1992). That court asked us to determine "whether municipalities may require electronic intermediaries to collect and remit amusement taxes on resold tickets." Our answer is no.

¶ 2                        BACKGROUND

¶ 3     In 1923, the Illinois General Assembly passed the Ticket Scalping Act, which prohibited owners of public entertainment venues from selling admission tickets anywhere other than the venues' box offices. See 1923 Ill. Laws 322. In 1935, the legislature broadened that statute beyond venue owners, and outlawed the sale of such tickets for more than face value. See 1935 Ill. Laws 707. This statute remained unchanged until 1991, when the legislature rewrote it to provide an exception for ticket brokers, who could avoid any penalties for selling tickets above the box office price by meeting several requirements, including registering with the Secretary of State and paying all applicable state and local taxes. See Ill.

Rev. Stat. 1991, ch. 121½, ¶ 157.32. The legislature amended, and expanded upon, these requirements in 1995. See 720 ILCS 375/1.5 (West 1996).

¶ 4　　That year, the City of Chicago also amended its municipal code to extend its existing amusement tax, which applied to admission fees for entertainment events in the city, to ticket resales. Under this amendment, "every reseller" was required to pay the amusement tax on "that portion of the ticket price that exceeds the amount that the reseller paid for the tickets." Chicago City Council, Journal of Proceedings, November 15, 1995, at 12016.

¶ 5　　In 2002, the legislature amended the Auction License Act, requiring "Internet Auction Listing Services" either located in Illinois or dealing with persons or property located in Illinois to register with the state's Department of Financial and Professional Regulation. See 225 ILCS 407/10-27(b) (West 2010). This amendment brought online auctioneers under the same regulatory umbrella that covered more traditional auctioneers, but the amendment also recognized the significant differences between them. Specifically, the statute defined an internet auction listing service as a website or other interactive computer service that brings together prospective sellers and buyers of personal property, but "does not examine, set the price, or prepare the description of the personal property ***, or in any way utilize the services of a natural person as an auctioneer." 225 ILCS 407/10-27(a)(1) (West 2010). The statute mandated that an internet auction listing service must certify that it "does not act as the agent of users who sell items on its website, and acts only as a venue for user transactions" (225 ILCS 407/10-27(c)(1) (West 2010)), and that it retains identification information on its users and their transactions, provides customer support for its users, and suspends users who engage in deliberate fraud. 225 ILCS 407/10-27(c)(2) to (6) (West 2010).

¶ 6　　Shortly thereafter, as tickets to entertainment events began to appear on such websites, the legislature replaced the Ticket Scalping Act with the Ticket Sale and Resale Act (Act) (720 ILCS 375/0.01 *et seq.* (West 2010)). The new statute still prohibited the sale of tickets for more than face value, but contained more exceptions, including one for internet auction listing services, which featured extensive and detailed consumer protection measures. Section 1.5(c) provides:

> "This Act does not apply to the sale of tickets of admission to a sporting event, theater, musical performance, or place of public entertainment or amusement of any kind for a price in excess of the printed box office ticket price by a reseller engaged in interstate or intrastate commerce on an Internet auction listing service duly registered with the Department of Financial and Professional Regulation under the Auction License Act and with the Office of the Secretary of State on a registration form provided by that Office. This subsection (c) applies to both sales through an online bid submission process and sales at a fixed price on the same website or interactive computer service as an Internet auction listing service registered with the Department of Financial and Professional Regulation.
>
> 　　This subsection (c) applies to resales described in this subsection only if the operator of the Internet auction listing service meets the following requirements:
>
> 　　　(1) the operator maintains a listing of the names and addresses of its corporate officers;

(2) the operator is in compliance with all applicable federal, State, and local laws relating to ticket selling activities, and the operator's officers and directors have not been convicted of a violation of this Act within the preceding 12 months;

(3) the operator maintains, either itself or through an affiliate, a toll free number dedicated for consumer complaints;

(4) the operator provides consumer protections that include at a minimum:

(A) consumer protection guidelines;

(B) a standard refund policy that guarantees to all purchasers that it will provide and in fact provides a full refund of the amount paid by the purchaser (including, but not limited to, all fees, regardless of how characterized) if the following occurs:

(i) the ticketed event is cancelled and the purchaser returns the tickets to the seller or Internet auction listing service; however, reasonable delivery fees need not be refunded if the previously disclosed guarantee specifies that the fees will not be refunded if the event is cancelled;

(ii) the ticket received by the purchaser does not allow the purchaser to enter the ticketed event for reasons that may include, without limitation, that the ticket is counterfeit or that the ticket has been cancelled by the issuer due to non-payment, unless the ticket is cancelled due to an act or omission by such purchaser;

(iii) the ticket fails to conform to its description on the Internet auction listing service; or

(iv) the ticket seller willfully fails to send the ticket or tickets to the purchaser, or the ticket seller attempted to deliver the ticket or tickets to the purchaser in the manner required by the Internet auction listing service and the purchaser failed to receive the ticket or tickets; and

(C) standards of professional conduct;

(5) the operator has adopted an independent and disinterested dispute resolution procedure that allows resellers or purchasers to file complaints against the other and have those complaints mediated or resolved by a third party, and requires the resellers or purchasers to submit to the jurisdiction of the State of Illinois for complaints involving a ticketed event held in Illinois;

(6) the operator either:

(A) complies with all applicable requirements of the Retailers' Occupation Tax Act and collects and remits all applicable federal, State, and local taxes; or

(B) publishes a written notice on the website after the sale of one or more tickets that automatically informs the ticket reseller of the ticket reseller's potential legal obligation to pay any applicable local amusement tax in connection with the reseller's sale of tickets, and discloses to law

enforcement or other government tax officials, without subpoena, the name, city, state, telephone number, e-mail address, user ID history, fraud complaints, and bidding and listing history of any specifically identified reseller or purchaser upon the receipt of a verified request from law enforcement or other government tax officials relating to a criminal investigation or alleged illegal activity; and

(7) the operator either:

(A) has established and maintains a consumer protection rebate fund in Illinois in an amount in excess of $100,000, which must be cash available for immediate disbursement for satisfaction of valid consumer complaints; or

(B) has obtained and maintains in force an errors and omissions insurance policy that provides at least $100,000 in coverage and proof that the policy has been filed with the Department of Financial and Professional Regulation." 720 ILCS 375/1.5(c) (West 2010).

¶ 7    StubHub, Inc., registered as an internet auction listing service in compliance with the Act. StubHub describes itself as "the world's largest online ticket marketplace" and operates a website or "platform" where users can buy and sell tickets to various events around the country. All users must register by providing personal information on the website. A user who wants to sell a ticket may list it on the website by submitting information about the event—the venue, date, time, and location of the ticket—as well as choosing a method and period for the sale, through a series of interactive prompts on the site. A user who wants to buy a ticket may then search for it on the site by the event, the date, or the venue. A prospective buyer and a prospective seller can communicate with each other only via the website. Once they have agreed upon a price, StubHub processes the sale, charging the buyer a service fee of 10% of that price, and the seller a 15% fee. Pursuant to the Act, StubHub informs its sellers of their tax obligations.

¶ 8    In 2006, the City amended its amusement tax ordinance again to require not only "resellers," but also "reseller's agents" to collect and remit the amusement tax. Under the ordinance, a reseller's agent is a

"person who, for consideration, resells a ticket on behalf of the ticket's owner or assists the owner in reselling the ticket. The term includes but is not limited to an auctioneer, a broker or a seller of tickets for amusements, as those terms are used in 65 ILCS 5/11-42-1, and applies whether the ticket is resold by bidding, consignment or otherwise, and whether the ticket is resold in person, at a site on the Internet or otherwise." Chicago Municipal Code § 4-156-010 (amended May 24, 2006).

The amendment further provided that ticket resellers and reseller's agents have a joint and several duty to collect and remit the tax to the City. Chicago Municipal Code § 4-156-030(A) (amended May 24, 2006). However, when a licensed ticket broker is not involved in the sale, the ordinance provides that the reseller's agent "shall be primarily responsible for collecting and remitting the tax, and the reseller shall be responsible for collecting and remitting only if the reseller's agent fails to do so." Chicago Municipal Code § 4-156-030(F) (amended May 24, 2006).

¶ 9        In 2007, the City sent a letter to StubHub stating that it might be deemed a reseller's agent under the ordinance, and might be required to collect and remit the amusement tax on behalf of its users. The letter requested information and documents with respect to StubHub's "facilitation" of ticket resales to entertainment events located in Chicago since January 1, 2000. StubHub declined to provide any of the information, and in 2008, the City filed a four-count complaint against StubHub. The City alleged that StubHub was a reseller's agent under the ordinance because it "resold and/or facilitated the resale" of tickets. Accordingly, the City claimed, StubHub had a joint and several duty to collect and remit the amusement tax on thousands of ticket resales from 2000 to the present. The City sought a declaration that StubHub was required to do so; a writ of *mandamus* ordering StubHub to produce records and submit to an audit; fines for StubHub's violation of the ordinance in refusing to comply with the City's request to produce records; and a monetary judgment in the amount of the tax revenues plus interest and penalties.

¶ 10       StubHub removed the case to federal court on diversity grounds (see 28 U.S.C. § 1332(a) (2006)), and filed a motion to dismiss. The federal district court granted that motion. *City of Chicago v. StubHub, Inc.*, 622 F. Supp. 2d 699, 704 (N.D. Ill. 2009). The federal district court stated that the City's power to impose an obligation on StubHub to collect and remit the amusement tax depended upon the nature of the tax. *Id.* at 703. Because our appellate court had decided that ticket resales were sales of tangible personal property (see *Mr. B's, Inc. v. City of Chicago*, 302 Ill. App. 3d 930, 937 (1998)), and the state legislature had preempted the City's authority to tax such property (see 65 ILCS 5/8-11-6a (West 2010)), the federal district court held that the City lacked the authority to require StubHub to collect and remit the amusement tax incurred by its sellers. *StubHub*, 622 F. Supp. 2d at 703-04.

¶ 11       The City appealed. The federal circuit court first examined, then rejected, StubHub's argument that federal law prohibited the City from imposing a tax on internet sites. *City of Chicago v. StubHub!, Inc.*, 624 F.3d 363, 367 (7th Cir. 2010). The federal circuit court then discussed Illinois law, noting that in a diversity case a district court is bound by state appellate court case law, but a circuit court is not:

        "We could make a decision, confident that any error would be corrected by the state judiciary before too much time had passed. As far as we can tell, however, the state judiciary will be unable to address this subject unless we certify. There are only two pending cases, both in federal court.[1] *** Both suits began in state court and were removed under the diversity jurisdiction. Any similar suit likewise would be removable. *** This means that the state judiciary may never have an opportunity to resolve this dispute. The only way the federal judiciary can be sure that it is applying authentic state law is to certify the subject to state court." *Id.* at 367-68.

¶ 12       The federal circuit court found no precedent from this court on the three principal questions in dispute, namely, "whether the tax works as an occupation tax, whether the

_____

        [1]The other case is *City of Chicago v. eBay, Inc.*, No. 10-1144, which was argued before the court of appeals in tandem with the StubHub case, and held in abeyance pending our decision here. See *StubHub!, Inc.*, 624 F.3d at 367. According to StubHub, eBay is its "corporate parent."

history of the 2005 amendment prevents Chicago from defining Internet auction sites as resellers' agents, and whether the amusement tax is one on 'tangible personal property.' " *Id.* at 367. Under Rule 20, the court certified a broader question: "whether municipalities may require electronic intermediaries to collect and remit amusement taxes on resold tickets." *Id.* at 368. According to the federal circuit court, it phrased the question in that way "to ensure maximum flexibility for the state judiciary, which may elect to address any of the three sub-questions we have already identified, or may conclude that some other issue altogether determines the appropriate answer." *Id.* We accepted certification, and allowed the County of Cook to file an *amicus curiae* brief in support of the City and eBay and Netchoice Coalition to file an *amicus curiae* brief on behalf of StubHub.

¶ 13                                    ANALYSIS

¶ 14    Initially, we must address the threshold question of whether StubHub is a "reseller's agent" under the ordinance. If it is not, the ordinance does not apply.

¶ 15    StubHub argues it is not a reseller's agent because it is not an agent for its users. StubHub notes that in order to obtain a license, it must certify that it is not its users' agent. See 225 ILCS 407/10-27(c)(1) (West 2010). According to StubHub, this statutory requirement recognizes that internet auction listing services do not act as agents, but rather as marketplaces that bring buyers and sellers together. Further, StubHub asserts that under common law agency principles, it lacks control over its users. Though it may terminate a user's access to its website, it does not dictate the terms of any sales.

¶ 16    The City argues that under the ordinance a reseller's agent is simply a person who, for consideration, resells a ticket for the ticket's owner or assists the owner in reselling the ticket. According to the City, StubHub fits this description. It allows ticket owners to list tickets for sale on its website, and offers them ways to do so that help potential buyers find the tickets they want. In return for these services, StubHub collects a fee from both buyers and sellers.

¶ 17    We agree with the City. The City is free to define terms in its code, and need not track common law agency principles. Under the ordinance, a reseller's agent is "a person who, for consideration, resells a ticket on behalf of the ticket's owner or assists the owner in reselling the ticket." Chicago Municipal Code § 4-156-010 (amended May 24, 2006). That term applies to StubHub because it provides services that help users sell their tickets, and it is compensated for those services. See *StubHub*, 624 F.3d at 366-67 ("intermediaries that take an active role in staging an auction and exchanging goods for money, as StubHub[ ] does, are resellers' agents"). We now turn to the central issue in this case: whether the City has the authority to impose an obligation upon online auctioneers to collect and remit its amusement tax. Our discussion begins with home rule.

¶ 18    Under the 1870 Illinois Constitution, the balance of power between our state and local governments was heavily weighted toward the state. The 1970 Illinois Constitution drastically altered that balance, giving local governments more autonomy. *Schillerstrom Homes, Inc. v. City of Naperville*, 198 Ill. 2d 281, 286-87 (2001); *City of Evanston v. Create, Inc.*, 85 Ill. 2d 101, 107 (1981) (quoting 4 Record of Proceedings, Sixth Illinois Constitutional Convention 3024). Municipalities now enjoy "the broadest powers possible"

(*Scadron v. City of Des Plaines*, 153 Ill. 2d 164, 174 (1992)) under the Constitution. Section 6(a) of article VII provides:

> "Except as limited by this Section, a home rule unit may exercise any power and perform any function pertaining to its government and affairs including, but not limited to, the power to regulate for the protection of the public health, safety, morals and welfare; to license; to tax; and to incur debt." Ill. Const. 1970, art. VII, § 6(a).

¶ 19    Section 6(a) gives municipalities any powers pertaining to their governments and affairs, including the power to tax, but not the power over matters such as divorce, real property, trusts, and contracts (7 Record of Proceedings, Sixth Illinois Constitutional Convention 1621). The framers' intent was clear: "the powers of home-rule units relate to their own problems," not problems more competently solved by the state. *Id.* The framers offered examples of problems suited to state or local authority, and suggestions on when one or the other would prevail. See *Id.* at 1652-57. The framers, however, understood that further interpretation of section 6(a)'s intentionally imprecise language would fall to the judicial branch. 4 Record of Proceedings, Sixth Illinois Constitutional Convention 3052.

¶ 20    That task has involved defining the parameters of the qualifying phrase "pertaining to." In this regard, Professor David Baum, counsel to the Committee on Local Government at the Sixth Illinois Constitutional Convention, has been a valuable resource to the court. In 1972, he wrote two articles, *A Tentative Survey of Illinois Home Rule (Part I): Powers and Limitations*, 1972 U. Ill. L.F. 137 (hereinafter *Part I*), and *A Tentative Survey of Illinois Home Rule (Part II): Legislative Control, Transition Problems, and Intergovernmental Conflict*, 1972 U. Ill. L.F. 559 (hereinafter *Part II*), both of which touch upon the tensions inherent in this area, and confirm our role in mediating the constitutional balance between state and local governments under section 6.

¶ 21    Professor Baum acknowledged that the "pertaining to" language created a "general and uncertain limitation" on local government power. *Part I*, 1972 U. Ill. L.F. at 152. But he insisted that section 6 as a whole was designed to prevent implied preemption, or preemption by judicial interpretation. *Id.* at 154.

> "[H]ome rule units are supposed to be free to carry on activities that relate to their communities even if the state is also interested and is active in the area. This idea is expressed in section 6(i), which provides that '[h]ome rule units may exercise and perform *concurrently with the State* any power or function of a home rule unit to the extent that the General Assembly by law does not *specifically* limit the concurrent exercise or *specifically* declare the State's exercise to be exclusive.' To the extent that state regulation is held to invalidate local power under the 'pertaining to...' language of section 6(a), the purpose of section 6(i) is undermined and defeated." (Emphases in original.) *Id.* at 154-55.

¶ 22    According to Professor Baum, section 6 does not contemplate "substantial restraint" on local power imposed by the courts (*id.* at 156), but that does not mean that the courts have no role. Any other interpretation would read the "pertaining to" language out of the constitution. Professor Baum concluded, "Certainly, the 'pertaining to ...' language leaves some leeway for judicial intervention. But if the constitutional design is to be respected, the

courts should step in to compensate for legislative inaction or oversight only in the clearest cases of oppression, injustice, or interference by local ordinances with vital state policies." *Id.* at 156-57. That is, because the legislature can always vindicate state interests by express preemption, only vital state interests would allow a court to decide that an exercise of home rule power does not pertain to local government and affairs. *Part II*, 1972 U. Ill. L.F. at 573.[2]

¶ 23 Essentially, the framers saw our role under section 6(a) as narrow, and over time we developed an analytical framework consistent with that view. In *Ampersand, Inc. v. Finley*, 61 Ill. 2d 537, 543 (1975), we noted the "dominant interest" of the state in the administration of justice and struck down a municipal ordinance imposing a fee on court filings to benefit a county library. In *People ex rel. Lignoul v. City of Chicago*, 67 Ill. 2d 480, 486 (1977), we concluded that pervasive regulation by the state regarding banking, as well as a constitutional provision on that subject, invalidated a municipal financial services ordinance. In *County of Cook v. John Sexton Contractors Co.*, 75 Ill. 2d 494, 508-09 (1979), we observed that "[t]he difficulty in determining the extent of home rule power arises because many matters are of both local and regional or statewide concern," and posited that the proper approach would be to decide which problems are "sufficiently local in character so as to be subject to the home rule power." Ultimately, in that case, we upheld a municipal zoning ordinance, and asserted that our conclusion was "buttressed by the history of local regulation of such matters." *Id.* at 511. In *City of Evanston v. Create, Inc.*, 85 Ill. 2d 101, 112-13 (1981), we hinted that a statutory scheme could evince "a statewide interest so compelling as to preclude home rule power." But we added, "The mere existence of State interest and activity in a particular field does not alone preclude home rule activity," and upheld a municipal landlord-tenant ordinance. *Id.* at 113.

¶ 24 These cases, and others, track our efforts in identifying which considerations help us determine when the state's interest in a subject is so paramount that regulation of it is beyond the reach of municipalities. Beginning in *Kalodimos v. Village of Morton Grove*, 103 Ill. 2d 483, 501 (1984), we clarified our analysis under section 6(a):

> "Whether a particular problem is of statewide rather than local dimension must be decided not on the basis of a specific formula or listing set forth in the Constitution but with regard for the nature and extent of the problem, the units of government which have the most vital interest in its solution, and the role traditionally played by local and statewide authorities in dealing with it."

¶ 25 This is not a "free-wheeling preemption rule" resting upon the mere existence of comprehensive state regulation. *Id.* at 502. Rather, the rule limits our function under section 6(a) to a threshold one, in which we can declare a subject off-limits to local government

---

[2]As Professor Baum indicates, the concept of a vital state policy trumping municipal power is analytically appropriate under section 6(a). That concept, however, is analytically inappropriate under section 6(i), which envisions concurrent state and local regulation. We acknowledge that the doctrinal lines have not always been clear, and in examining the relationship between a statute and an ordinance, we have discussed whether there is a vital state policy involved. See, *e.g.*, *Scadron*, 153 Ill. 2d at 190. If a subject pertains to local government and affairs, and the legislature has not expressly preempted home rule, municipalities may exercise their power.

control only where the state has a vital interest and a traditionally exclusive role. This test was used by a unanimous court as the definitive analysis under section 6(a) in *Scadron v. City of Des Plaines*, 153 Ill. 2d 164, 176 (1992), *Village of Bolingbrook v. Citizens Utilities Co. of Illinois*, 158 Ill. 2d 133, 139 (1994), and *Schillerstrom Homes, Inc. v. City of Naperville*, 198 Ill. 2d 281, 290 (2001). It is now settled law.

¶ 26    Initially, we must examine the nature and extent of the problem. The City devotes most of its briefs here to a defense of its amusement tax ordinance, as applied to ticket resales. But the City has home rule authority to tax (see Ill. Const. 1970, art. VII, § 6(a)), and statutory authority to tax amusements (see 65 ILCS 5/11-42-5 (West 2010)). Thus, the problem is not the tax, but its collection by internet auction listing services, whose users created a new market in online ticket resales. That was the City's concern when it amended its ordinance in 2006 to require reseller's agents to collect and remit its amusement tax. That was also a concern for the state when, a year earlier, it enacted section 1.5(c)(6) of the Ticket Sale and Resale Act. The regulatory aims of the City and the state intersect.

¶ 27    Next, we must examine whether the state or the City has a greater interest in solving that problem. Obviously, the City has an interest in collecting its amusement tax. But the state has an interest in who does the collecting, which is related to its vital interest in preserving and regulating the emerging market for online ticket resales across Illinois.

¶ 28    Before the City amended its code, the General Assembly had already displayed a keen understanding that online auctioneers employ a new business model, uniquely suited to statewide regulation. When the legislature amended the Auction License Act in 2002, it defined an internet auction listing service as a virtual place where prospective sellers and buyers meet, as opposed to a natural person who examines, describes, and prices the property to be sold. See 225 ILCS 407/10-27(a)(1) (West 2010). The legislature required entities offering such a service to certify that they do not act as an agent for sellers, but only as a venue for user transactions. See 225 ILCS 407/10-27(c)(1) (West 2010). However, the legislature made online auctioneers accountable to the Department of Financial and Professional Regulation, like traditional auctioneers, presumably to guard users against fraud. See 225 ILCS 407/10-27(b) (West 2010).

¶ 29    When the legislature considered House Bill 873, which later became the Ticket Sale and Resale Act in 2005, it continued to recognize the need to regulate online auctioneers, and the need to treat them differently. The legislative record offers valuable insight in this regard.[3] The transcripts from the House Committee on Consumer Protection hearings on the bill are replete with references to the emerging market in online ticket resales, and the lack of any regulation of those transactions. In one hearing Representative Saviano, the bill's sponsor, stated, "There's a new way of doing business, and we're providing those consumer protections in the new way of doing business." House Committee on Consumer Protection,

---

[3]Typically, we refer to legislative history only when interpreting an ambiguous statute, and there is no suggestion from the parties that the Act is ambiguous. But we are not engaged in statutory construction. Instead, we are attempting to determine the magnitude of the state's interest in solving the problem.

March 1, 2005, at 11.

¶ 30    Similar themes emerge from the House and Senate debates. In the House, Representative Saviano noted that the bill resulted from six months of negotiations, in an effort to "get a handle" on, and impose consumer protection measures upon, online ticket resales. 94th Ill. Gen. Assem., House Proceedings, Apr. 15, 2005, at 129 (statements of Representative Saviano). Representative Saviano then discussed the City's amusement tax:

> "[T]he bill states that if a ticket seller, for example, sells Chicago event tickets on eBay, eBay will automatically inform the ticket seller of their obligation to collect and remit *** the City of Chicago's amusement tax. If the City of Chicago becomes aware of an eBay user or specific group of eBay users who are habitually failing to remit and collect the city's tax ***, then the Bill gives the city the right to obtain from eBay that user's real name, address and transaction history upon submitting a specific request to eBay. From this information, the city may pursue whatever legal action it deems necessary to collect any back taxes or prosecute the user or users for fraud." *Id.* at 130-31.

¶ 31    In the Senate, Senator Harmon also mentioned that this was a "heavily negotiated bill," which legalized a new secondary market for ticket resales. 94th Ill. Gen. Assem., Senate Proceedings, May 18, 2005, at 14 (statements of Senator Harmon). Senator Harmon stated that the City was "neutral," and the only opposition came from Senators sympathetic to ticket brokers. *Id*. at 14-15. Senator Dillard offered a floor amendment, which he said would "level the playing field" between ticket brokers and internet auction listing services, and impose the same tax collection obligations on both groups. *Id.* at 15 (statements of Senator Dillard). Senator Harmon responded that the bill regulated millions of dollars worth of ticket resales, and would ultimately result in increased tax revenues for the city. *Id.* at 16 (statements of Senator Harmon).

¶ 32    Senator Harmon later explained:

> "Let's say *** that the Cubs and White Sox made it to the World Series and you had two tickets that you could not use. The face value of the tickets is fifty dollars and the market is *** at five hundred dollars. Under current law today, your only option if you wanted to resell those tickets, would be to sell them to a broker for fifty dollars for the face value. He then turns around and sells them for five hundred dollars, pays any amusement taxes that might be due and keeps more than four hundred dollars in profit, per ticket for himself. Under this bill, if you could post them on an online Internet auction site you could sell them to the highest bidder, the five hundred dollars. You would pay eBay a commission *** and you would have to pay the amusement tax yourself if one were applicable, but you would keep that four hundred dollar profit per ticket for yourself. Now let me highlight the key difference, and that's the business model. A broker buys and sells tickets. [eBay] never buys, never sells, never owns, never holds, never even sees the ticket. They are merely a market place. Whoever rises in *** opposition to this bill will likely tell you that there's an amendment *** that would mandate that eBay would collect the tax and make it a level playing field. We are not changing the law with respect to the amusement tax.

The seller still has to remit the amusement tax, if there is an amusement tax applicable." 94th Ill. Gen. Assem., Senate Proceedings, May 20, 2005, at 65-66 (statements of Senator Harmon).

He then likened internet auction listing services to lessors and stated that requiring them to collect and remit the amusement tax "would be like saying that the landlord of the ticket broker is now responsible for collecting the amusement tax on behalf of the ticket broker." *Id.* at 66. Senator Harmon concluded by stating his belief that the City would not lose revenue and would actually gain revenue because the bill contained a provision that internet auction listing services must prompt and direct ticket resellers to remit the amusement tax themselves. *Id.*

¶ 33    The Ticket Sale and Resale Act now allows ticket resellers to skirt the ban on scalping if they use the services of online auctioneers who meet various requirements, including assurances in the name of consumer protection similar to those expected of ticket brokers. Compare 720 ILCS 375/1.5(b)(1) (West 2010), with 720 ILCS 375/1.5(c)(1) (West 2010). Significantly, however, the legislature chose not to include the tax collection obligation that the Act places on ticket brokers (see 720 ILCS 375/1.5(b)(4) (West 2010)) among the requirements it places on internet auction listing services. Instead, the legislature gave such services the choice of collecting and remitting all federal, state, and local taxes, or notifying resellers of their own liabilities for any applicable local amusement taxes and also disclosing any personal information about a reseller requested by municipal tax officials in relation to a criminal investigation. See 720 ILCS 375/1.5(c)(6) (West 2010).

¶ 34    StubHub contends that in order to comply with the City's ordinance, it would have to alter its business model, fashioning features on its website through which it could verify at least the face value of the ticket. However, under its current user agreement, and consistent with the Auction License Act (see 225 ILCS 407/10-27(a)(1) (West 2010)), StubHub does not examine the tickets that its users list for resale. StubHub also notes that if other municipalities followed the City's lead and required internet auctioneers to collect and remit amusement taxes, there could potentially be a patchwork of local regulations. The legislature considered such burdens, and decided not to impose them, preferring instead a more comprehensive and uniform approach. We conclude that the state has a vital interest in regulating online auctioneers and protecting consumers, and consequently a greater interest than any municipality in local tax collection by internet auction listing services.

¶ 35    Finally, we must examine whether the state or the municipality has a traditional role in solving the problem. The City certainly has a traditional role in collecting its amusement tax, but not from internet auction listing services. There, the City does not have a traditional role. The state, however, has a long history of protecting consumers, dating back to 1961 with the criminalization of deceptive practices (720 ILCS 5/17-0.5 (West 2010)) and the enactment of the Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/1 *et seq.* (West 2010)). Further, it has regulated auctioneers for more than 10 years, and ticket resales for 20 years. And it has regulated scalping in some form since 1923. In fact, the City did not begin to tax ticket resales until the state allowed ticket brokers to avoid the ban on scalping. And it did not impose a tax collection obligation on reseller's agents until the state had considered and rejected such an obligation, preferring to mitigate the effects of local taxes on internet

auction listing services, by allowing them to choose not to collect those taxes. We conclude that the state has traditionally played a greater role in addressing the problems in this area.

¶ 36    The state has a greater interest than the City and a more traditional role in addressing the problem of tax collection by internet auctioneers. The Act, and the debates which produced it, evince an intent by the legislature to allow internet auction listing services to opt out of any obligation regarding local tax collection. That is a policy decision this court is ill-advised to ignore. The City's ordinance—specifically the imposition of a joint and several duty on internet auction listing services to collect and remit its amusement tax (Chicago Municipal Code § 4-156-020(A)) and the requirement that internet auction listing services are primarily responsible for collecting and remitting this tax (Chicago Municipal Code § 4-156-030(F))—does not pertain to its own government and affairs. The City has overstepped its home rule authority.

¶ 37    The City argues, however, that even if it lacks the home rule authority to require internet auction listing services to collect its amusement tax on ticket resales, it retains statutory authority to do so. The City relies on section 11-42-5 of the Municipal Code, which was enacted in 1961 and still provides:

"The corporate authorities of each municipality may license, tax, regulate, or prohibit hawkers, peddlers, pawnbrokers, itinerant merchants, transient vendors of merchandise, theatricals and other exhibitions, shows, and amusements and may license, tax, and regulate all places for eating or amusement." 65 ILCS 5/11-42-5 (West 2010).

¶ 38    As the federal trial court correctly noted, "There is no doubt that the City has the authority to impose a tax on the venues that sell tickets to amusements." *StubHub*, 622 F. Supp. 2d at 700 (citing 65 ILCS 5/11-42-5 (West 2010)). Additionally, "the parties do not dispute the fact that if a person sells a ticket for more than face value within the jurisdiction of the City of Chicago, he or she is required to pay the City's 8% amusement tax." *Id.* at 703. The question posed by the federal appeals court here does not address the City's authority to tax ticket resales, but rather the City's authority to impose an obligation on internet auction listing services to collect this tax.

¶ 39    StubHub argues that section 11-42-5 does not expressly allow municipalities to impose such an obligation. This point is well-taken, and the City cannot dispute it. The City attempts to plug this hole in the statutory language by referring to its "inherent authority" to effectuate its amusement tax.

¶ 40    The City relies upon *Sherman-Reynolds, Inc. v. Mahin*, 47 Ill. 2d 323 (1970), *Heyman v. Mahin*, 49 Ill. 2d 284 (1971), and *S. Bloom, Inc. v. Korshak*, 52 Ill. 2d 56 (1972). *Sherman-Reynolds, Inc.* and *Heyman* are inapposite because they involved the state's power to designate various entities its tax collectors, and the state's power in that regard is not as limited as the City's power. In *S. Bloom, Inc.*, we held that a municipality could require wholesalers and retailers to collect its cigarette tax without violating the constitutional prohibition on local occupation taxes. *S. Bloom, Inc.*, 52 Ill. 2d at 62. We stated that making distributors collect taxes was "not an uncommon nor improper" scheme. *Id.* at 63 (quoting *Monamotor Oil Co. v. Johnson*, 292 U.S. 86, 93 (1934)). But online auctioneers are not

-13-

distributors. They do not sell or resell tickets, or act as agents for their users, but rather simply provide a marketplace. See 225 ILCS 407/10-27(c)(1) (West 2010). They are one step removed from the actual transaction. Thus, *S. Bloom, Inc.* does not help the City.

¶ 41 We have recognized that a municipality may have some implied power, ancillary to the express power granted by the legislature and necessary to the exercise of that power. See *Kanellos v. County of Cook*, 53 Ill. 2d 161, 166 (1972); *cf. Fischer v. Brombolich*, 207 Ill. App. 3d 1053, 1059 (1991). We have not articulated the contours of this implied power in previous cases, and we need not do so in this case. The City acknowledges that if a municipality lacked home-rule authority to impose a tax collection requirement on internet auction listing services, as it does here, and instead imposed such a requirement pursuant only to its implied authority, that requirement would be invalid if it conflicted with any statute.

¶ 42 Here, there is a clear conflict. The City's ordinance requires online auctioneers to collect and remit the City's amusement tax, and the Act does not. The Act provides that, unlike ticket brokers, who must collect local amusement taxes (see 720 ILCS 375/1.5(b)(1) (West 2010)), online auctioneers may instead decide whether to collect those taxes or notify ticket resellers of their own liabilities for such taxes and disclose personal information about resellers at the request of local tax officials (see 720 ILCS 375/1.5(c)(6) (West 2010)). We do not believe the legislature intended to take away the choice it offered to internet auction listing services in 2005 when it allowed municipalities to tax amusements in 1961. Sellers and resellers of tickets may be made to collect the tax; internet auction listing services may not.

¶ 43                                    CONCLUSION

¶ 44 For the reasons that we have expressed, we conclude that Illinois municipalities may not require electronic intermediaries to collect and remit amusement taxes on resold tickets.

¶ 45 Certified question answered.

**Dissenting Opinion Upon Denial of Rehearing**

¶ 46 JUSTICE THOMAS, dissenting:

¶ 47 I initially joined the opinion in this case. In its petition for rehearing, however, the City of Chicago has convinced me that this court made numerous serious errors in its analysis and issued an opinion that is fundamentally at odds with this court's established precedent. The City raises two main points: (1) this court neglected to address one of its principal arguments on appeal; and (2) this court's opinion has "radically redefined, and diminished, home-rule authority in Illinois." Both points are well-taken, and this case deserves rehearing. The court has chosen to modify its opinion on denial of rehearing, but has not satisfactorily answered the points raised by the City. Therefore, I must respectfully dissent.

¶ 48    I. This Court Neglected the City's Argument That It Had Statutory
        Authorization to Require StubHub to Collect the Amusement Tax

¶ 49    The question certified by the Seventh Circuit was broad: "whether municipalities may require electronic intermediaries to collect and remit amusement taxes on resold tickets." The City asserted that it had two independent bases for requiring StubHub to collect the amusement tax: (1) home rule authority; and (2) section 11-42-5 of the Municipal Code (65 ILCS 5/11-42-5 (West 2010)) and the City's inherent authority that accompanies it. In its first opinion, this court, without explanation, addressed only the home rule argument. The court has now modified its opinion to address the statutory argument, but its analysis is wholly unconvincing.

¶ 50    I am not going to dwell too long on the statutory argument, because the home rule analysis is the most problematic part of the court's opinion. I will briefly address why the court's statutory analysis does not work, and this will serve as a good introduction to the home rule argument, because the same error informs the majority's analysis of both issues. The majority declares that it need not concern itself with determining the limits of the City's implied power to collect its amusement tax because the City has such power only if its ordinance does not conflict with any statute. The majority then states that, "[h]ere, there is a clear conflict." *Supra* ¶ 42. This incorrect notion that there is a conflict between the City's ordinance and the state's statute underlies and informs both the statutory argument and the home rule argument.

¶ 51    The first thing that the majority states in arguing that the ordinance and the statute conflict is that "[t]he City's ordinance requires online auctioneers to collect and remit the City's amusement tax and the Act does not." *Supra* ¶ 42. Of course, this is not a conflict. If this is a conflict, then the ordinance conflicts not only with the Act but also with every other Illinois statute. There would be a conflict only if the statute forbad municipalities from requiring online auctioneers to collect and remit amusement taxes. Next, we turn to the majority's misreading of the statute. The majority states that, "The Act provides that, unlike ticket brokers, who must collect amusement taxes (see 720 ILCS 375/1.5(b)(1) (West 2010)), *online auctioneers may instead decide whether to collect those taxes or notify ticket resellers of their own liabilities for such taxes* and disclose personal information about resellers at the request of local tax officials." (Emphasis added.) *Supra* ¶ 42. That is not what the Act says.

¶ 52    The Act provides that a ticket *seller* does not violate the Act's ban on selling tickets above face value when the seller uses an internet auction listing service that meets seven requirements. One of these requirements is that the listing service either collect applicable taxes or publish a written notice that the seller must do so. The City's ordinance requires reseller's agents to collect its amusement tax. Nothing in the Act states that a home rule unit may not require internet auction listing services to collect the tax. The majority misreads the statute as *requiring* that internet auction listing services be given a choice whether to collect the tax or publish the notice. It does no such thing. It provides the circumstances under which a ticket *seller* does not violate the Act.

¶ 53    To strip the statute and the ordinance down to their essential points for purposes of this issue, here is what we have:

-15-

Statute: A ticket seller does not violate the Act when he resells a ticket above face value if he sells it through an internet auction listing service that either collects applicable amusement taxes or notifies the seller of his obligation to pay the tax.

Ordinance: Reseller's agents must collect amusement taxes.

Under what principle of statutory construction is this a conflict *at all*, much less a clear one? All this means is that, for resold tickets for Chicago events, the listing service will be the one that collects amusement taxes. There is nothing in the Act's plain language that would prohibit a home rule unit from requiring an internet auction listing service to collect its amusement tax; the majority is seeing a conflict that does not exist. The City has it exactly right in its petition for rehearing when it states that "the court's decision interpreted the Ticket Act's criminal safe harbor, which is provided in certain circumstances to persons who sell tickets on internet websites, to free an entirely different entity (the website itself) of an entirely different obligation (collection of the City's amusement tax) imposed by an entirely different legislative measure than either the Ticket Act or the Criminal Code (the City's ordinance)."

¶ 54    If the legislature wants to enact a statute forbidding municipalities from requiring internet auction listing services to collect amusement taxes, it is free to do so. Similarly, if the legislature wants to enact a statute that says that internet auction listing services are given a choice whether to collect amusement taxes or publish a notice that sellers are required to pay the tax, it is free to do so. Here, however, we are concerned only with the statute the legislature enacted, and it does not do either of these things. The majority quotes individual state legislators to support its misreading of the statute, but this court held in *People v. R.L.*, 158 Ill. 2d 432, 442 (1994), that it gives the statements of individual legislators little weight when searching for the intent of the entire legislative body. That should particularly be the case here when the statements the majority quotes show that certain legislators may have been unaware of what the statute actually said. As the City points out, there is simply no way to know whether the dozens of other legislators voted on the bill based on these incorrect characterizations, or whether they understood what the bill actually said. I, for one, am unwilling to assume that the entire legislature was unaware of the language of the statute it was enacting.

¶ 55    Two cardinal rules of statutory construction are that: (1) when reasonably possible, legislative enactments should be construed so that they do not conflict (*Chavda v. Wolak*, 188 Ill. 2d 394, 402 (1999)); and (2) when statutory language is clear and unambiguous, resort to extrinsic aids of construction—such as legislative history—is improper (*People v. Collins*, 214 Ill. 2d 206, 214 (2005)). What the majority does here is to begin with clear, unambiguous statutory language that does not conflict with the ordinance, then turn to the legislative debates to manufacture a conflict where none exists, and then use that alleged conflict to invalidate the ordinance. This is not how we do things. Of course, the majority denies being engaged in statutory construction at all. *Supra* ¶ 29 n.3. But, clearly, the majority does not believe this, because it later states that, "[t]he Act, *and the debates which produced it*, evince an intent by the legislature to allow internet auction listing services to opt out of any obligation regarding local tax collection." (Emphasis added.) *Supra* ¶ 36. You cannot discern legislative intent from the statute *and the debates that produced it*, and then claim that you

are not engaging in statutory construction. Similarly, you cannot give the statute a meaning other than what its plain language provides without construing the statute.

¶ 56    It should be noted, too, that, although the majority has modified its opinion in response to the City's petition for rehearing, it has not addressed the City's argument that the court misread the statute. Instead, the majority simply doubles down on its mischaracterization of the Act, making untrue statements such as the following: (1) "The Act provides that, unlike ticket brokers, who must collect local amusement taxes (see 720 ILCS 375/1.5(b)(1) (West 2010)), online auctioneers may instead decide whether to collect those taxes or notify ticket resellers of their own liabilities for such taxes and disclose personal information about resellers at the request of local tax officials (see 720 ILCS 375/1.5(c)(6) (West 2010))" (*supra* ¶ 42); and (2) "the legislature gave such services the choice of collecting and remitting all federal, state, and local taxes, or notifying resellers of their own liabilities for any applicable local amusement taxes" (*supra* ¶ 33). If the majority is going to go to the trouble of modifying its opinion on denial of rehearing, then this is the most important argument it should be addressing, as it goes to the heart of both issues before the court.

¶ 57    I would also point out that the Seventh Circuit saw no conflict between the statute and the ordinance either. In an opinion written by Chief Judge Easterbrook, that court noted that nothing in the Ticket Act's language would prohibit municipalities from labeling electronic commerce sites as agents. As for StubHub's attempt to try to get there through legislative history, the Seventh Circuit was having none of it, and assumed that this court would not do so either:

> "The argument, in other words, is that although the legislative history of a federal statute may be used only to resolve ambiguities in the enacted text, see *Puerto Rico Department of Consumer Affairs v. Isla Petroluem Corp.*, 485 U.S. 495 (1988), Illinois would give the force of law to legislative history that explains the *absence* of particular provisions in the legislation." (Emphasis in original.) *City of Chicago v. StubHub!, Inc.*, 624 F.3d 363, 367 (7th Cir. 2010).

Apparently, that is what we do in Illinois.

¶ 58    The fact that the ordinance and the statute clearly do not conflict shows that the court has not adequately disposed of the City's argument that it has implied authority to collect its amusement tax. As we will see next, the court's seeing a conflict where none exists informs much of its erroneous home rule analysis as well.

¶ 59            II. The Court's Opinion Has Radically Redefined and Diminished
                                    Home Rule in Illinois

¶ 60    The most troubling part of the court's opinion is its reasoning with respect to why the ordinance in question exceeds Chicago's home rule authority. If this decision is left to stand, then decades of this court's home rule jurisprudence have been swept aside, and this court has embarked on a course directly contrary to the state's constitutional design. This court holds today that the City exceeded its home rule authority by enacting an ordinance that requires internet auction listing services to collect and remit its amusement tax on resold tickets. According to the majority, this ordinance exceeds the City's home rule authority

-17-

because the ordinance does not pertain to the City's government and affairs, as it must under section 6(a) of the Illinois Constitution (Ill. Const. 1970, art. VII, § 6(a)) to be a valid exercise of home rule authority.

¶ 61    Right off the bat, there would seem to be a fundamental problem with the majority's conclusion. Notably, the majority does not hold—nor could it—that the amusement tax *itself* exceeds the City's home rule authority. Clearly, the amusement tax pertains to the City's government and affairs. Not only is the tax specifically authorized by statute (see 65 ILCS 5/11-42-5 (West 2010)), but it is clearly an example of the most important type of power afforded to home rule units by the constitution. Although the constitution grants home rule units broad powers to perform *any* function pertaining to their government and affairs, it specifically lists four such powers: (1) "the power to regulate for the protection of the public health, safety, morals and welfare"; (2) "to license"; (3) "*to tax*"; and (4) "to incur debt." (Emphasis added.) Ill. Const. 1970, art. VII, § 6(a). As Professor Baum has explained, by listing the taxation power specifically in the constitution, "Illinois courts will not be able to hold, as have courts in other states, that the power of taxation is not a local power and therefore does not fall within the home rule grant." David C. Baum, *A Tentative Survey of Illinois Home Rule (Part I): Powers and Limitations*, 1972 U. Ill. L.F. 137, 141.

¶ 62    The Local Government Committee of the 1970 constitutional convention explained that the powers to tax and to incur debt were the most important powers granted to home rule units because these powers "are essential if home-rule is to enable counties and municipalities to perform the functions demanded of them in this increasingly complex and urbanized world." Report of the Local Government Committee, 7 Record of Proceedings, Sixth Illinois Constitutional Convention 1625. The committee further explained that "[i]t is important for the proper functioning of state governments and the federal government that governments at the local level should have sufficient financial resources to carry on their proper activities." *Id.* at 1626. For this reason, the committee chose to specifically list the revenue and debt powers in section 6(a) and also to make it difficult for the legislature to deny these powers. Pursuant to section 6(g), denying the power of a home rule unit to tax requires a vote of three-fifths of both houses of the legislature. The reason for this is clear: "There appears to have been wide acceptance of the view that financial resources are the key to successful home rule, and that the state should not easily be able to prevent home rule units from obtaining resources by imposing local taxes (other than income, earnings and occupation taxes)."[4] David C. Baum, *A Tentative Survey of Illinois Home Rule (Part II): Legislative Control, Transition Problems, and Intergovernmental Conflict*, 1972 U. Ill. L.F. 559, 564. Among the examples that the local government committee gave of taxes that would be valid and could only by denied by a three-fifths vote were taxes on gasoline sales, liquor, hotel rooms, cigarettes, food, and drugs. In *Commercial National Bank of Chicago v. City*

---

[4]I am assuming for the sake of argument that the amusement tax is not an occupation tax, which was a separate issue briefed by the parties. I am also assuming that the majority has concluded that the amusement tax is not an occupation tax, for if the type of tax in question was specifically forbidden by the constitutional text, there would be no reason for majority to invoke judicial preemption under section 6(a).

-18-

*of Chicago*, 89 Ill. 2d 45, 59 (1981), this court listed amusement taxes as a type of tax "clearly within the scope of the examples set out in the majority committee report."

¶ 63    There can be little question, then, that the City's amusement tax ordinance pertains to its government and affairs under section 6(a), and there is no statute denying home rule units the power to tax amusements, much less one enacted by three-fifths of both houses. The question that the court must answer, then, is this: If the amusement tax *itself* pertains to the City's government and affairs, then how can an ordinance whose sole purpose is to collect that very tax *not* pertain to the City's government and affairs? Indeed, if the ordinance in question does not pertain to the City's government and affairs, what does it pertain to? The majority opinion rests on a logical and analytical impossibility. The majority fails to answer these questions, instead merely confirming that it agrees that the amusement tax pertains to the City's government and affairs. So, according to the majority, taxing amusements in Chicago unquestionably falls squarely within the City's home rule powers, but actually collecting *Chicago's* amusement tax pertains *only* to the government and affairs of the *state*. Surely such a holding requires more explanation than the majority has provided.

¶ 64    Further complicating the problem for the majority, this court has explained that *all* municipalities, whether home rule or not, possess both: (1) powers that are incidental to powers expressly granted; and (2) powers that are indispensable to the accomplishment of the purposes of the municipal corporation. *Scadron v. City of Des Plaines*, 153 Ill. 2d 164, 174 (1992); *Pesticide Public Policy Foundation v. Village of Wauconda*, 117 Ill. 2d 107, 112 (1987). The powers of home rule units, of course, are much broader than this, allowing them to exercise *any* power and perform *any* function "pertaining to [their] government and affairs." Ill. Const. 1970, art. VII, § 6(a). The power to collect a tax is unquestionably a power incidental to the taxation power itself. See, *e.g.*, *S. Bloom, Inc. v. Korshak*, 52 Ill. 2d 56, 63 (1972) (quoting *Monamotor Oil Co. v. Johnson*, 292 U.S. 86, 93 (1934), for the proposition that requiring an entity other than the one on whom the legal incidence of the tax falls to collect the tax is "a common and entirely lawful arrangement"). And, the reason that the collection requirement often falls on other entities is clear, as this court explained in discussing a use tax: "The ultimate incidence of the use tax falls upon the consumer. However, because of the impracticality of collecting the tax from individual purchasers, the burden of its collection is imposed upon the out-of-state vendor." *Brown's Furniture, Inc. v. Wagner*, 171 Ill. 2d 410, 418 (1996). One could easily argue that, here, requiring entities other than the individual upon whom the amusement tax falls is "indispensable to the accomplishment of the declared objects and purposes of the municipal corporation" (*Pesticide Public Policy*, 117 Ill. 2d at 112), but, at a minimum, it is clearly incidental to the taxation power expressly granted (*cf. Sherman-Reynolds, Inc. v. Mahin*, 47 Ill. 2d 323, 327 (1970) (upholding employer withholding as complementary to the income tax power because "if the taxes contemplated by the Act are not fully collected, the public need and the purposes of the tax will be thwarted")). Thus, to further refine the question I posed above, if the amusement tax itself pertains to the City's government and affairs, then how can the necessary and implied power to collect that same tax *not* pertain to the City's government and affairs? This court should answer these questions.

¶ 65    What I have stated above is sufficient, all by itself, to defeat the majority opinion, and

I could easily end this dissent here. I believe that I must go on, however, because the analysis that the majority uses to invalidate the City's ordinance threatens to sweep away decades of this court's home rule jurisprudence and set us on a course directly contrary to our state's constitutional design. In short, the essence of the majority's approach is this. The majority sees in the Ticket Sale and Resale Act and its legislative history reason to believe that the area in question should be one of exclusive state control. The legislature has not, however, specifically preempted home rule in this area, so the court has taken it upon itself to judicially preempt the City's ordinance. The problem with this approach? This is the approach applied in many other states, and it is precisely what the framers of the 1970 Constitution intended to abolish.

¶ 66    Getting the easy matters out of the way first, there is no question that the legislature has not preempted home rule authority in the area in question. In order for the state to preempt home rule authority, the legislature must include language that specifically states that the area is one of exclusive state control. Ill. Const. 1970, art. VII, § 6(h); *City of Chicago v. Roman*, 184 Ill. 2d 504, 515-17 (1998). If a taxing power is being denied, the legislature must do so by a three-fifths vote of both houses. Ill. Const. 1970, art. VII, § 6(g). Moreover, comprehensive legislation is insufficient to preempt home rule authority; the legislation in question must "contain express language that the area covered by the legislation is to be exclusively controlled by the State." *Roman*, 184 Ill. 2d at 517 (quoting *Village of Bolingbrook v. Citizens Utilities Co. of Illinois*, 158 Ill. 2d 133, 138 (1994)). The same rules apply to partial exclusion. If the state wishes to limit the power of home rule units to act concurrently with the state, it also must do so with specific language. Ill. Const. 1970, art. VII, § 6(i). *Roman*, 184 Ill. 2d at 519-20. The legislature has codified and endorsed these principles in section 7 of the Statute on Statutes (5 ILCS 70/7 (West 2010)), which provides as follows:

> "No law enacted after January 12, 1977, denies or limits any power or function of a home rule unit, pursuant to paragraphs (g), (h), (i), (j), or (k) of Section 6 of Article VII of the Illinois Constitution, unless there is specific language limiting or denying the power or function and the language specifically sets forth in what manner and to what extent it is a limitation on or denial of the power or function of a home rule unit."

This court formally adopted section 7 as part of its home rule jurisprudence in *Schillerstrom Homes, Inc. v. City of Naperville*, 198 Ill. 2d 281, 287 (2001).

¶ 67    Here, there is no language in the Ticket Sale and Resale Act (or any other statute) excluding or limiting home rule authority to collect amusement taxes on resold tickets. Consequently, the City's power to act in this area may not be considered restricted. As if the above were not enough, I would also note that the legislature did not request a home rule note when enacting the amendment in question. Under section 5 of the Home Rule Note Act, "[e]very bill that denies or limits any power or function of a home rule unit shall have prepared for it before second reading in the house of introduction a brief explanatory note that includes a reliable estimate of the probable impact of the bill on the powers and functions of home rule units." 25 ILCS 75/5 (West 2010). A request for a home rule note may be made by the sponsor of the bill (25 ILCS 75/10 (West 2010)) or, if the sponsor

-20-

believes no home rule note is necessary, by any member of either house, upon a majority vote (25 ILCS 75/15 (West 2010)). Here, no home rule note was requested as to House Bill 873 (94th General Assembly). Thus, in addition to failing to include any language in the Ticket Sale and Resale Act preempting or limiting home rule authority, the legislature did not follow the required procedures for denying or limiting a function of a home rule unit.

¶ 68    Faced with a belief that the area should be one of exclusive state control, but with no preemption language to rely on, the majority takes the only path available to it and declares the area to be one that does not pertain to the City's government and affairs under section 6(a) of the constitution. The majority notes that the framers acknowledged that section 6(a) would require judicial interpretation, and the majority relies on Professor Baum, who served as counsel to the Local Government Committee at the 1970 constitutional convention. The irony of citing Professor Baum is that the majority opinion is a textbook example of how Professor Baum argued that section 6(a) should *not* be used. Professor Baum pointed out that the wording of section 6(a) threatened "to produce *significant and largely unexpected* limitations on the authority of home rule counties and municipalities." (Emphasis added.) 1972 U. Ill. L.F. at 152. Moreover, Professor Baum predicted that courts would be tempted to rely on section 6(a) to resolve perceived conflicts between state statutes and local ordinances, and explained why such an approach should not be used:

> "*One possible approach is to look back to section 6(a)* which confines home rule power to matters pertaining to the affairs and government of the home rule unit. Perhaps a court, when faced with unavoidable state-local conflict,[5] should determine whether the subject matter is of statewide importance, or rather pertains to local affairs. If the latter, the home rule unit would prevail; if the former, the state would prevail. *The difficulty with this approach is that it is similar to that employed in other states and thus was not favored for Illinois by the drafters of the constitution.* Furthermore, it does not take account of the fact that the state legislation always can prevail, if the legislature specifically so provides and thereby complies with section 6(h). Since the state always can vindicate its interests by legislating in the proper form, it seems unwise to sustain state legislation at the expense of home rule ordinances except when a state statute is in the required form or in those few cases where vital state interests would be sacrificed by permitting the local legislation to prevail until the next session of the General Assembly."[6] (Emphases added.) 1972 U. Ill. L.F. at 573.

¶ 69    Moving on, let us now consider how the majority uses section 6(a). The majority traces the history of the state's regulation of internet auctioneers and determines that the state has a greater interest than the City in this area. In other words, if the state has a history of comprehensively regulating an area, this court will step in and preempt home rule authority

---

[5]Of course, as I set forth above, we do not even have a state-local conflict, much less an unavoidable one.

[6]In *Roman*, this court quoted from and endorsed this passage from Professor Baum's article. See *Roman*, 184 Ill. 2d at 519.

under section 6(a). Our case law holds the exact opposite. Here is what this court has actually held:

> "Further, 'comprehensive' legislation is insufficient to declare the state's exercise of power to be exclusive. To 'meet the requirements of section 6(h), legislation must contain express language that the area covered by the legislation is to be exclusively controlled by the State. [Citations.] It is not enough that the State comprehensively regulates an area which otherwise would fall into home rule power.' *Village of Bolingbrook v. Citizens Utilities Co.*, 158 Ill. 2d 133, 138 (1994). After *Citizens Utilities*, 'comprehensive scheme' preemption is 'no longer the law of this state.' *Board of Trustees of the Barrington Police Pension Fund v. Village of Barrington Ethics Board*, 287 Ill. App. 3d 614, 619 (1997). 'The General Assembly cannot express an intent to exercise exclusive control over a subject through coincidental comprehensive regulation.' *American Health Care Providers, Inc. v. County of Cook*, 265 Ill. App. 3d 919, 928 (1994)." *Roman*, 184 Ill. 2d at 517.

In this passage from *Roman*, the court was talking about preemption under section 6(h). Nevertheless, it would make no sense at all for this court to hold that comprehensive state regulation removes an area from the reach of home rule units under the "pertaining to" language of section 6(a) because then a court would never get past the first step of the analysis and consider preemption. The majority's decision threatens to render decisions such as *Roman*, *Scadron*, and *Citizens Utilities* entirely meaningless. Clearly, what the majority is engaging in here is simply comprehensive regulation preemption by another name. The majority should answer this question: If comprehensive state regulation renders an area entirely outside the reach of home rule units, then how does our case law rejecting comprehensive regulation preemption have any meaning at all?

¶ 70    How does the majority arrive at its erroneous view of section 6(a)? The majority apparently believes that *Kalodimos v. Village of Morton Grove*, 103 Ill. 2d 483 (1984), supports the idea that comprehensive regulation renders an area one of exclusive state control, but this is *not* what *Kalodimos* held. In *Citizens Utilities*, the defendant argued that because the Public Utilities Act comprehensively regulated public utilities, home rule units did not have the authority under section 6(a) of the constitution to enact an ordinance affecting the operations of a public utility. In a unanimous opinion authored by Justice Miller, this court rejected that proposition, explaining that, "[a]s stated in *Kalodimos*, the historic regulation of an area is *merely one factor to consider* in determining whether the area is of local dimension." (Emphasis added.) *Citizens Utilities*, 158 Ill. 2d at 139. It is not clear how we went from "merely one factor to consider" to the whole ball game. Further, even if *Kalodimos* did say what the majority claims it did, that position would not have survived *Citizens Utilities*, because, as this court explained in *Roman*, "[a]fter *Citizens Utilities*, 'comprehensive scheme' preemption is 'no longer the law of this state.' " *Roman*, 184 Ill. 2d at 517.

¶ 71    Today's decision is unprecedented, as it marks the *only* time in this court's history that this court has ever invalidated an ordinance under section 6(a) solely on the basis of state regulation. That is the approach that the constitution was designed to *eliminate*, and the majority has put us right back to square one. As the City points out in its petition for

rehearing, *every* case in which this court has invalidated a home rule ordinance under the "pertaining to" language of section 6(a) involves an ordinance that either: (1) had an obvious extraterritorial effect on at least one other local government; or (2) conflicted with another provision of the constitution.[7] The reason that the court has never invalidated an ordinance under section 6(a) because of state regulation is obvious: if comprehensive state regulation removes an area from the ambit of home rule under section 6(a), then all of this court's decisions rejecting comprehensive regulation preemption would be rendered meaningless. Thus, we can clearly see that there is *no* support for the majority's invalidation of the City's ordinance solely on the basis of state regulation.

¶ 72    What, then, is the proper approach to analyzing an ordinance under section 6(a)? This court has adopted two entirely different and conflicting approaches. One approach is that used by the majority—the *Kalodimos* approach in which a court considers " 'the nature and extent of the problem, the units of government which have the most vital interest in its solution, and the role traditionally played by local and statewide authorities in dealing with it.' " *Supra* ¶ 24 (quoting *Kalodimos*, 103 Ill. 2d at 501). The origin of this test is somewhat mysterious. *Kalodimos* cites *Ampersand, Inc. v. Finley*, 61 Ill. 2d 537 (1975), but that test does not specifically appear in *Ampersand*.[8] Anyway, the *Kalodimos* test is essentially what Professor Baum described as the "flexible approach" to applying section 6(a). As explained by Baum, under the flexible approach, "in each case in which local ordinances and state legislation cover the same subject matter, the courts should decide whether the subject matter is suitable for local control or is better handled at the state level or can be subjected to both state and federal regulation without harm." 1972 U. Ill. L.F. at 155.

¶ 73    The problem with such an approach, as explained by Professor Baum, is that it is subversive of the constitution:

"But despite its many advantages, the flexible approach seems wrong. We should face squarely that section 6 grants broad powers to home rule units subject to restraints imposed primarily by the General Assembly either by a three-fifths vote or by a declaration of exclusive state jurisdiction under authority expressly reserved in sections 6(g) and 6(h). The language does not contemplate substantial restraint added by judicial interpretation; *indeed, it was designed to make this interpretation difficult if not impossible. A judicial preemption doctrine based upon the existence of legislative regulation was specifically frowned upon.*

---

[7]The City string cites 15 of these cases and explains how the ordinance in each fell into one of these two categories.

[8]The result in *Ampersand* fits comfortably in the category of cases in which this court invalidated a home rule ordinance because the ordinance in question was found to interfere with the unified court system established in the constitution. Its discussion of section 6(a), however, was rooted entirely in two examples that the local government committee gave of when comprehensive state regulation would invalidate a home rule ordinance. See *Ampersand*, 61 Ill. 2d at 541. The case was decided long before this court disavowed comprehensive regulation preemption, and the fact that the *Kalodimos* approach is rooted entirely in *Ampersand* is evidence of its dubious validity.

The design of section 6 places *great responsibility upon the legislature* to ensure that home rule does not degenerate into provincialism which could injure the people of the state. This emphasis on legislative authority to limit home rule, plus the specification of ways in which the legislature must act to assert its authority, makes the Illinois home rule provision unique. Judicial limitations imposed on home rule in other states should not be very persuasive in Illinois because of our unique approach to the problem.

*If the legislature does not perform its job, it is true that the people of the state may suffer. But that is, by and large, the fate mandated by section 6 of the Local Government Article.* Certainly, the 'pertaining to ...' language leaves some leeway for judicial intervention. But *if the constitutional design is to be respected*, the courts should step in to compensate for legislative inaction or oversight only in the clearest cases of oppression, injustice, or interference by local ordinances with vital state policies." (Emphases added.) 1972 U. Ill. L.F. at 156-57.

I would ask my colleagues in the majority to consider whether their analysis makes it "difficult if not impossible" for the judiciary to preempt a home rule ordinance. Of course, it does not. In fact, after this opinion becomes final, it will be quite simple for the judiciary to invalidate any number of home rule ordinances. Now, not only can the judiciary invalidate home rule ordinances on the basis of comprehensive state regulation, no conflict between the ordinance and the statute is even required. And the state regulation does not even have to be comprehensive. The majority holds explicitly that it will invalidate a home rule ordinance if it determines that the state has a greater interest and a more traditional role in an area. *Supra* ¶ 35. And, apparently, home rule ordinances can be invalidated on the basis of statements made by individual state legislators.

¶ 74　　Despite the glaringly obvious problems with the *Kalodimos* approach, is it now "settled law" (*supra* ¶ 25), such that we have no choice but to follow this erroneous path unless solid grounds exist to depart from *stare decisis*? No. The reason this is so is that this court has also adopted a second, and contradictory, approach for when it will apply judicial preemption. As noted above, Professor Baum argued that, rather than having a flexible approach to section 6(a), the courts should step in only in the clearest cases of oppression, injustice, or interference with vital state policies. This court has specifically endorsed this approach. In *Scadron*, 153 Ill. 2d at 190, this court quoted the above language from Professor Baum and agreed that courts should apply judicial preemption only in these limited circumstances. This court expanded on this idea in *Roman*, when it quoted Professor Baum for the idea that the judiciary should preempt a home rule ordinance only " 'in those few cases where vital state interests would be sacrificed by permitting the local legislation to prevail until the next session of the General Assembly.' " *Roman*, 184 Ill. 2d at 519 (quoting 1972 U. Ill. L.F. at 573).

¶ 75　　This court has treated the vital state policy approach as if it is a third "judicial preemption" step in the analysis to be considered after a court determines that a matter pertains to a home rule unit's government and affairs under section 6(a) and has also considered whether the legislature specifically preempted home rule authority (see *Scadron*, 153 Ill. 2d at 174-90; *Roman*, 184 Ill. 2d at 512-19), as if the court invalidating an ordinance

-24-

under the *Kalodimos* approach to section 6(a) would be something other than judicial preemption.[9] But this approach makes no sense. When Professor Baum used the language quoted in *Scadron* and *Roman*, he was specifically talking about section 6(a)'s "pertaining to" provision. See 1972 U. Ill. L.F. at 157. And this has to be correct. A moment's reflection shows why it makes no sense at all to have the *Kalodimos* flexible approach to section 6(a) and then to apply the vital state policy test as a third step in the analysis: if something were truly a vital state policy, then the court would never even get to step three because the ordinance would be invalidated under the *Kalodimos* test in step one. Clearly, then, it makes no sense to apply *both* the *Kalodimos* test *and* the vital state policy test as separate parts of the analysis. These are both section 6(a) tests.

¶ 76 Notably, in the only area in which we have identified a vital state policy, we did not apply a *Kalodimos*-type approach to the section 6(a) question. Rather, we applied an approach just like the one advocated by Professor Baum. In *County of Cook v. John Sexton Contractors Co.*, 75 Ill. 2d 494, 514 (1979), the court held that, because of our constitution's expressed policy that it is the duty of each person and the state to "provide and maintain a healthful environment for the benefit of this and future generations" (Ill. Const. 1970, art. XI, § 1), home rule units could act in the area of environmental regulation only in a way that conformed to state legislation. However, the court did not doubt for an instant that the matter was one pertaining to the home rule unit's government and affairs under section 6(a) because our constitutional system is set up to recognize that *both* a home rule unit *and* the state may have a legitimate interest in the same issue. *John Sexton Contractors*, 75 Ill. 2d at 508-11.

¶ 77 Clearly, this court should adopt either the *Kalodimos* approach *or* the one set forth in *Scadron* and *Roman*. It makes no sense to have both, and, indeed, it is impossible to have both. Between the two, I obviously advocate for the *Scadron* and *Roman* approach because the *Kalodimos* approach is contrary to the constitutional design. The *Kalodimos* approach improperly requires the court to choose whether the home rule unit or the state has a greater interest, when the whole point of the home rule provisions of the constitution is that *both* may have an interest. As Professor Baum explained, "home rule units are supposed to be free to carry on activities that relate to their communities *even if the state also is interested and is active* in the area." (Emphasis added.) 1972 U. Ill. L.F. at 155. That is the whole purpose of section 6(i), and a *Kalodimos*-type approach is contrary to the express language of that section.[10] The plain language of section 6(i) shows beyond all doubt that the majority's analysis is improper. That section allows home rule units to exercise any power concurrently with the state except when the state has expressly limited or excluded the right of home rule

---

[9]Indeed, if what my colleagues are doing here is something other than judicial preemption, then I invite them to say what that other thing is. If they concede, as I believe they must, that they are applying judicial preemption, then they must also concede that we have irreconcilable contradictions in our case law.

[10]If my colleagues in the majority disagree with this point, I invite them to explain how a test that requires a court to assess whether the state or a home rule unit has the more vital interest in solving a problem is not directly contrary to the plain language of section 6(i).

units to act in an area. Ill. Const. 1970, art. VII, § 6(i). If the constitution specifically grants home rule units the right to act concurrently with the state whenever that power has not been limited or excluded, then how can this court invalidate home rule ordinances on the basis that the state has a "greater interest" and a "more traditional role" in an area? *Supra* ¶ 36. Answer: *It cannot*. The court has adopted a test that is *directly contrary* to clear, binding constitutional text.[11]

¶ 78　　The majority's response to the conflicting approaches in our case law is to acknowledge the conflict and then ignore it. The majority concedes that the vital state policy test this court has used makes sense only as a section 6(a) test. *Supra* ¶ 22 n.2. However, the majority then proceeds right ahead with the *Kalodimos* approach, without making any attempt to reconcile the conflict. According to the majority, *Kalodimos* "clarified" the section 6(a) analysis (*supra* ¶ 24), which is certainly a difficult claim to make, given that it came years before the court adopted a contradictory approach in cases such as *Scadron* and *Roman*. The majority then claims that we are stuck with *Kalodimos* because a unanimous court used it as the "definitive" section 6(a) analysis in three cases. *Supra* ¶ 25. However, in one of these cases—*Scadron*—the court also used Professor Baum's approach to section 6(a). I am not sure how this can be considered a "definitive" endorsement of *Kalodimos*. Also, what are we to make of the fact that in *Roman* this court just as unanimously endorsed Professor Baum's vital state policy test, which the majority concedes works only as a section 6(a) test? Saying that a unanimous court has endorsed the *Kalodimos* test does not resolve the conflict; it merely creates confusion, prolongs the conflict, and puts the matter off for another day. And, notably, the majority makes no attempt to explain how the *Kalodimos* test is not subversive of the constitution.

¶ 79　　I would also point out that, even if we are going to keep the constitutionally suspect *Kalodimos* approach, this court should not do what the majority does here and consider the section 6(a) question without regard to whether the legislature has acted under the other subsections of section 6. In determining whether an area is one of statewide concern, how can this court *not* consider that the legislature has taken no steps under sections 6(g), (h), or (i) to make it one? In fact, this court has already held that the legislature's failure to act under the preemption sections is relevant to considering whether an ordinance pertains to a home rule unit's government and affairs. *City of Evanston v. Create, Inc.*, 85 Ill. 2d 101 (1981), was a case in which the defendant argued that Evanston's landlord and tenant ordinance was not a valid exercise of the city's home rule power under section 6(a). As part of this court's analysis, it noted that the legislature had taken no action under either section 6(g) or 6(h) to make it one. *Id*. at 109. This court even specifically held that, because the state had taken no specific action to make the area of landlord-tenant relations one of exclusive state control, the city's ordinance was a valid exercise of its powers under section 6(a). *Id*. at 115. *Mulligan v. Dunne*, 61 Ill. 2d 544 (1975), is to the same effect. That was likewise a section

---

[11]It is unsettling, too, to see the majority acknowledge that this is a new area of the law and then invalidate the ordinance because the state got there first. *Supra* ¶ 35. As with the rest of the majority's analysis, this approach is directly contrary to the constitutional text and to what the framers intended.

6(a) case, in which the plaintiffs argued that a Cook County tax on alcoholic beverages was beyond the County's home rule powers under section 6(a). This court rejected that argument and held that, because the legislature had not specifically preempted home rule authority, the tax was valid under section 6(a): "since the General Assembly has not by a three-fifths majority chosen to limit the power of home-rule units to tax liquor, Cook County has not exceeded its home-rule power under section 6(a) by the enactment of its liquor tax ordinance." *Id.* at 551. Applying the *Mulligan* analysis here, we could simply substitute "amusement" for "liquor" and "Chicago" for "Cook County" and hold that, "since the General Assembly has not by a three-fifths majority chosen to limit the power of home-rule units to tax amusements, Chicago has not exceeded its home-rule power under section 6(a) by the enactment of its amusement tax ordinance."

¶ 80      Even in *Kalodimos*, after this court set forth the constitutionally suspect test for section 6(a), this is how the court actually applied that test *in the very next paragraph*:

"The plaintiffs seek to apply a free-wheeling preemption rule to the exercise of home rule power. *They argue in effect that a subject is preempted whenever it is of significant concern to the State or whenever a uniform statewide solution to the problems it entails might arguably be more manageable than individual control by local units of government.*[12] Home rule, however, is predicated on the assumption that problems in which local governments have a legitimate and substantial interest should be open to local solution and reasonable experimentation to meet local needs, free from veto by voters and elected representatives of other parts of the State who might disagree with the particular approach advanced by the representatives of the locality involved or fail to appreciate the local perception of the problem. (See Report of the Committee on Local Government, 7 Proceedings 1605-11; *City of Evanston v. Create, Inc.* (1981), 85 Ill. 2d 101, 107; *Kanellos v. County of Cook* (1972), 53 Ill. 2d 161, 166; Baum, *A Tentative Survey of Illinois Home Rule (Part I): Powers and Limitations*, 1972 U. Ill. L.F. 137, 154-56.) To give home rule the latitude it requires, the court held in *City of Evanston v. Create, Inc.* that a city's substantial interest in regulating relations between landlord and tenant permitted the passage of an ordinance restricting landlords' rights in residential leases to a greater extent than a State statute on the subject, in the absence of any indication in the statute of an intent that State control of the field be exclusive or of any effect on residential leases outside the city as a result of the ordinance. This court has upheld the right of local governments to enact their own solutions to various other problems of local concern in the face of less stringent or conflicting State regulation, following a determination that the State's expression of interest in the subject as evidenced by its statutory scheme did not amount to an express attempt to declare the subject one requiring exclusive State control. (*County of Cook v. John Sexton Contractors Co.* (1979), 75 Ill. 2d 494 (county zoning ordinance restricting use of land for sanitary landfill

---

[12]Note that the "free-wheeling preemption rule" described and rejected in *Kalodimos* is precisely the one that the majority employs here, despite the majority's protestation to the contrary.

purposes); *Stryker v. Village of Oak Park* (1976), 62 Ill. 2d 523 (ordinance specifying the composition of village's board of fire and police commissioners); *Peters v. City of Springfield* (1974), 57 Ill. 2d 142 (ordinance reducing mandatory retirement age for policemen and firemen below that specified by a State statute); *Mulligan v. Dunne* (1975), 61 Ill. 2d 544, *cert. denied* (1976), 425 U.S. 916, 47 L. Ed. 2d 768, 96 S. Ct. 1518 (county tax on retail sale of liquor).) *These holdings follow the mandate of section 6(i) of the local government article of the Constitution that home rule units may exercise home rule powers concurrently with the State until the General Assembly 'specifically' limits such exercise or declares the State's exercise to be exclusive*. (Ill. Const. 1970, art. VII, sec. 6(i).) They also are consistent with sections 6(g) and 6(h) of that article (Ill. Const. 1970, art. VII, secs. 6(g), (h)), which provide the exclusive methods by which the legislature may preempt a home rule power." (Emphases added.) *Kalodimos*, 103 Ill. 2d at 502-03.

Thus, even *Kalodimos* recognized that the determination of whether an area was one pertaining to a home rule unit's government and affairs under section 6(a) could not be made without considering whether the state had acted to make the area one of exclusive state control. If the majority is wedded to the *Kalodimos* approach, then it should at least apply that approach the same way that *Kalodimos* did. The majority undertakes a section 6(a) analysis that is completely divorced from the way this court has previously analyzed section 6(a), and the revival of preemption by state regulation is therefore not surprising.

¶ 81     If considering the legislature's failure to act under the preemption sections merely made sense before the enactment of section 7 of the Statute on Statutes, it is mandatory after it. Again, this section very clearly establishes three things for laws enacted after January 12, 1977: (1) if the legislature intends to preempt home rule authority in its entirety, it will include specific language doing so; (2) if the legislature intends merely to limit home rule authority, it will state so specifically and will detail in what manner the power of home rule limits is limited; and (3) in the absence of any such language, the authority of home rule units cannot be considered restricted. How can it not be relevant to determining whether an issue is one appropriate for home rule power that the legislature has made *no effort* to make the area one of exclusive state control?

¶ 82     Moreover, even if the majority is committed to the *Kalodimos* test, and even if it does not apply that test in the same manner that this court always has, its conclusion is *still* not correct because it fails to properly balance the City's and the state's interests. The majority acknowledges that the City has a valid interest in collecting its amusement tax, but argues that the state has an interest in who does the collecting. *Supra* ¶ 27. But the City clearly wins when these interests are balanced because the only hope it has of collecting its amusement tax on resold tickets is if the internet auction listing service collects the tax. No one has seriously disputed the impracticality of the City going after every individual who resells a ticket online, and the City stands to lose all of this revenue if it may not designate internet auction listing services as reseller's agents. By contrast, the state's interests are vindicated either way. The majority states that the state has an interest in who does the collecting, but the state's policy is spelled out in the statute: it wants people reselling tickets only through those internet auction listing services that either collect amusement taxes or notify sellers of

their obligation to do so. If the ordinance is upheld, the state's interests are 100% vindicated. For resold tickets for Chicago amusements, internet auction listing services will be collecting the amusement tax. Thus, any balancing of the interests weighs in favor of the City, not the state. And, again, here we may concern ourselves only with the statute that the legislature actually enacted, not the statute that any individual state legislator thought was enacted.

¶ 83    Because the *Kalodimos* test is indefensible on its face, however, we should put it to rest once and for all. I would analyze the section 6(a) "pertaining to" question as follows. First, consistent with our case law, I would consider whether the City's ordinance conflicted with a provision of the constitution or had an obvious extraterritorial effect. StubHub has not identified a provision of the constitution that would prohibit home rule units from requiring electronic intermediaries to collect amusement taxes on resold tickets. StubHub has argued that the ordinance has an extraterritorial effect, but I agree with the City that it does not. This court held in *Create, Inc.*, 85 Ill. 2d at 116, that the "question of whether a home rule enactment has extraterritorial effect is answered by focusing on the subject being controlled." Here, the City's amusement tax ordinance taxes payments for the privilege to attend amusements that take place only within Chicago. The ordinance does not have an extraterritorial effect on another unit of local government.

¶ 84    Next, consistent with Professor Baum's recommended approach to section 6(a), endorsed by this court in *Scadron* and *Roman*, I would consider whether the ordinance is oppressive, unjust, or interferes with vital state policies. There is obviously nothing oppressive or unjust about the City's ordinance. Moreover, it is not even arguable that a vital state policy is involved. "Vital" means "of the utmost importance : essential to the continued existence, vigor, efficiency, independence, or value of something expressed or implied" (Webster's Third New International Dictionary 2558 (1993)) or "essential to the existence or continuance of something; indispensable *** of crucial importance" (Webster's New World Dictionary 1589 (2d coll. ed. 1986)). And, as this court explained in *Roman*, the vital state policy exception is so narrow that it is to be invoked only in those situations where the policy is so vital that we literally cannot wait for the next session of the General Assembly to take action. *Roman*, 184 Ill. 2d at 519 (quoting 1972 U. Ill. L.F. at 572-73). To date, the only time that this court has arguably found a policy to be a "vital state policy" was in the realm of environmental protection, and that was because such a policy is declared in the constitution. See *John Sexton Contractors*, 75 Ill. 2d at 514-15.

¶ 85    Here is how the *John Sexton Contractors* court arrived at its conclusion. In that case, the issue was whether a contractor who wished to operate a sanitary landfill in unincorporated Cook County had to comply both with the Environmental Protection Act (Ill. Rev. Stat. 1977, ch. 111½, ¶ 1001 *et seq.*) and a zoning ordinance promulgated pursuant to the County's home rule powers. This court categorically rejected the notion that the state's comprehensive regulation of environmental matters was determinative of the issue and noted that the legislature had not specifically denied or limited home rule power in this area. *John Sexton Contractors*, 75 Ill. 2d at 510. However, this court noted that, in *City of Chicago v. Pollution Control Board*, 59 Ill. 2d 484 (1974), it had modified the doctrine of home rule precedence in the field of environmental regulation because of the following policy statement in the constitution:

"The public policy of the State and the duty of each person is to provide and maintain a healthful environment for the benefit of this and future generations. The General Assembly shall provide by law for the implementation and enforcement of this public policy." Ill. Const. 1970, art. XI, § 1.

The *City of Chicago* court had examined the constitutional history and determined that the framers intended that the legislature would provide leadership and uniform standards on pollution control. *City of Chicago*, 59 Ill. 2d at 489. Thus, the *John Sexton Contractors* court determined that, "as applied to environmental pollution, home rule governmental units are limited to adopting only those uniform standards established by the Board pursuant to legislative authority." *John Sexton Contractors*, 75 Ill. 2d at 514-15. Notably, in *Create, Inc.*, we held that these same concerns would *not* apply to landlord-tenant law because there was no similar *constitutional mandate* involved. *Create, Inc.*, 85 Ill. 2d at 110. Similarly, here, there is no vital policy expressed in the constitution that internet auction listing services should not have to collect local amusement taxes on resold tickets.

¶ 86    It should be noted that, although the majority endorses the *Kalodimos* approach, it does also attempt to argue that a vital state policy is involved here. Without even acknowledging our case law's requirement that a vital state policy come from the constitution, the majority claims that the state has a vital interest here, but it never explains why it is any more "vital" than anything else that the state is interested in. So, to date, this court has now identified two vital state policies: (1) the right of every citizen to a healthful environment (*John Sexton Contractors*, 75 Ill. 2d at 514-15); and (2) regulating the emerging market for online ticket resales (*supra* ¶ 27). The majority cannot be using the generally accepted meanings of the word "vital" that I set forth above, for if the latter is a vital state policy, then everything is.

¶ 87    In sum, the City has convinced me that the court should grant rehearing. This court has revived the thoroughly repudiated doctrine of comprehensive regulation preemption and adopted an analysis that is diametrically opposed to what the framers intended. To make matters worse, the court does so in a case in which there is no comprehensive regulation conflicting with the ordinance. Nothing in the plain language of the Ticket Sale and Resale Act contradicts the City's ordinance. The statute and the ordinance can easily stand together. If the majority's analysis is allowed to stand, then countless home rule ordinances have been put at risk, and the courts will likely soon begin invalidating ordinances that the legislature had no intention of preempting. According to the majority, this court may now invalidate any home rule ordinance in any area of the law where the stApril 10, 2013ate has a greater interest and a more traditional role. *Supra* ¶ 36. This is not what the constitution says, and it is not what the framers intended. Indeed, this position threatens to nullify section 6(i) of the constitution, which specifically recognizes that home rule units are free to carry on activities even in areas where the state is also interested and active. I do not mean to suggest, of course, that good reasons do not exist for home rule to be preempted or restricted in this area. The policy reasons put forth by StubHub are compelling, and the legislative history shows that at least some legislators believed that this should be an area of exclusive state control. Whether an area *should* be one of exclusive state control, however, is an entirely separate question from whether the legislature has done *what it needs to do and what it has said it would do* to make the area one of exclusive state control. Clearly, the legislature has

not done what it needs to do under the constitution, this court's case law, or section 7 of the Statute on Statutes, and no justification exists for this court to do the legislature's job for it. If this court's home rule precedents are to have any meaning at all, and if we are going to enforce the home rule provisions of the constitution as the framers intended, then this opinion must be withdrawn and rehearing granted. I will close with the words of Justice Miller, one of the court's strongest voices in favor of home rule autonomy. Writing for a unanimous court in *Citizens Utilities Co.*, 158 Ill. 2d at 142-43, Justice Miller, stated that:

> "We decline to depart from historical precedent and adopt an implied preemption doctrine of home rule authority in Illinois. As stated earlier in this opinion, in order to exempt an area from home rule authority, the legislature must act as provided in section 6 of the 1970 Illinois Constitution. It has been over 22 years since the effective date of the 1970 Illinois Constitution, and we believe the legislature has had ample time to enact appropriate legislation where it feels that home rule power should be somehow limited. The General Assembly has addressed the Public Utilities Act (See Pub. Act 84-671, eff. January 1, 1986), and failed to enact the language required by section 6. *It is not for us to usurp a function accorded to the General Assembly by the Constitution.*" (Emphasis added.)

It has now been over 40 years since the effective date of the 1970 Illinois Constitution, and Justice Miller's words ring truer than ever.

¶ 88      CHIEF JUSTICE KILBRIDE and JUSTICE KARMEIER join in this dissent.