2018 IL App (1st) 180654

SIXTH DIVISION
September 21, 2018

No. 1-18-0654

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| JOSEPH BERRIOS, in His Official Capacity as Assessor of Cook County, Illinois; and JOHN K. NORRIS, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiffs-Appellants, | ) ) ) | |
| v. | ) ) | No. 18 CH 1102 |
| THE COOK COUNTY BOARD OF COMMISSIONERS and THE COOK COUNTY BOARD OF ETHICS, | ) ) ) ) ) | Honorable Sanjay Tailor, Judge Presiding. |
| Defendants-Appellees. | ) | |

PRESIDING JUSTICE DELORT delivered the judgment of the court, with opinion. Justices Cunningham and Harris concurred in the judgment.

**OPINION**

¶ 1     On January 26, 2018, Joseph Berrios, the Assessor of Cook County, and John K. Norris, an attorney who practices real estate taxation law before the assessor's office, filed a two-count complaint against the Cook County Board of Commissioners and Cook County Board of Ethics (collectively, the "Cook County defendants") for injunctive and declaratory relief. Berrios and Norris challenge the application and validity of various provisions of the Cook County Ethics Ordinance. The circuit court rejected these challenges and granted summary judgment to the Cook County defendants. We affirm.

¶ 2                                   BACKGROUND

¶ 3      In 1993, the Cook County Board of Commissioners (county board) adopted the original

version of the Cook County Ethics Ordinance (Ethics Ordinance). Cook County Code of

Ordinances §§ 2-560-2-642 (approved Aug. 3, 1993). The Ethics Ordinance establishes rules of

conduct for county officials and employees. It creates a Cook County Board of Ethics (Ethics

Board) and empowers it to enforce the Ethics Ordinance. The Ethics Ordinance has long

imposed restrictions on campaign donations to county officials from lobbyists and persons who

either contract with the county or seek to do business with the county. On October 5, 2016, the

county board amended the Ethics Ordinance by expanding these restrictions to also include

persons seeking "official action from the County." The plaintiffs' complaint challenges the

following three provisions of the Ethics Ordinance, as amended in 2016.

¶ 4      Section 2-585(b) of the Ethics Ordinance provides as follows:

           "(b) No person who does business with the County [(Cook

           County)] or who has done business with the County within the

           preceding four years; or is seeking to do business with the County;

           or is a person required to register as a lobbyist with the County; or

           who has sought official action by the County within the preceding

           four years, or is an officer, director or partner of a firm, contracted

           by the County to act as financial counsel, bond counsel,

           underwriter's counsel, legal counsel, or financial manager for the

           issuance of any bond and directly working on said bond

           transaction; or firm, officers, directors or partners, contracted by

           the County to provide financial audits of County finances and

directly working on said contract shall make contributions in an aggregate amount exceeding $750.00:

(1) To any candidate for County office or elected County official during a single candidacy; or

(2) To any elected official of the government of the County during any nonelection year of his or her term.

(3) To any local, state, or federal political committee that is established in support of, a specific candidate for County office or an elected County official. The combined effect of these provisions is intended to permit total contribution up to, but not exceeding, $1,500.00 in a year in which a candidacy occurs. A year, for purposes of this Section, is from January 1 to December 31 of each year." Cook County Code of Ordinances § 2-585(b) (approved Oct. 5, 2016).

¶ 5 Section 2-585(f) of the Ethics Ordinance states as follows:

"(f) Any candidate for any County office or any current elected official in Cook County government shall return contributions found in excess of the limitations set forth in this Section within 30 days of notification from the Board of Ethics. Failure to return contributions within 30 days shall be a violation of this Section and subject to fines under Section 2-602." Cook County Code of Ordinances § 2-585(f) (approved Oct. 5, 2016).

¶ 6 Section 2-602(d) of the Ethics Ordinance provides:

"(d) The Board [of Ethics] may impose a fine of up to $1,000.00 per offense on any person, including officials or

3

candidates, found by the Board to have knowingly violated any provision of this article other than Section 2-574 or 2-583, to have knowingly furnished false or misleading information to the Board or to have failed to cooperate with an investigation under this article." Cook County Code of Ordinances § 2-602(d) (approved Oct. 5, 2016).

Unless context dictates otherwise, we will refer to these three provisions as the "Ethics Ordinance," even though the full text of the Ethics Ordinance is much longer.

¶ 7      Normally, candidates for public office in Illinois may not accept contributions of more than $5600 from a single individual source during an election cycle. 10 ILCS 5/9-8.5(b), (g) (West 2016); Ill. State Bd. of Elections, Contribution Limits Per Election Cycle (Jan 1, 2017), https://www.elections.il.gov/Downloads/CampaignDisclosure/PDF/ContributionSummary.pdf. However, candidates may donate unlimited amounts to their own campaign funds, as may their immediate family members. 10 ILCS 5/9-8.5(h) (West 2016). Under section 9-8.5(h), when a candidate for county office (or family member) donates $100,000 or more to his own campaign fund, the contribution limits in section 9-8.5(b) no longer apply. This event is known colloquially as a self-funding candidate "lifting the caps."

¶ 8      The following recitation of facts is taken from the pleadings and exhibits of record. Berrios ran for re-election in the March 2018 General Primary Election[1] against a self-funding candidate who donated "more than $800,000 to his [own] campaign committee since May 2017." Because of the aggregate effect of the contribution limits in both the Ethics Ordinance and the

---

[1]  We take judicial notice that he lost that election. See *Jackson v. Board of Election Commissioners*, 2012 IL 111928, ¶ 22 n.1 (holding that courts may take judicial notice of election results).

4

Election Code (10 ILCS 5/1-1 *et seq.* (West 2016)), Berrios's committees could only receive contributions of $750 per election cycle or non-election year from individuals seeking "official action" from Cook County, even though the Election Code's caps were lifted because a self-funding candidate was running against him. Despite the Ethics Ordinance's restrictions, Berrios's opponent was able to donate unlimited sums to his own campaign. Berrios was not prohibited from doing so himself, but he did not do so.

¶ 9     As a matter of course of regular business, the Ethics Board compared the contributions that Berrios's committees received and compared them to public records showing that attorneys and law firms sought property tax reductions from the assessor's office. This analysis revealed that some of those attorneys and law firms contributed more than $750 to one or more campaign committees related to Berrios. On July 21, 2017, the Executive Director of the Ethics Board sent "Notice[s] of Excess Contributions" to Berrios in his dual roles as chair of his own campaign committee (the Berrios committee) and as Committeeman of the 31st Ward Democratic Organization (the 31st ward committee). The Ethics Board issued these notices pursuant to the Ethics Ordinance's safe harbor provision, section 2-585(f), which gives a candidate the opportunity to avoid being fined for accepting an excess contribution if the candidate simply returns the excess portion within 30 days of being notified by the Ethics Board. The notices stated that the committees had reported receiving particular donations in excess of $750 from attorneys or law firms that represented taxpayers before the assessor's office and demanded that the excess portions of the contributions be returned. Berrios and his committees declined to do so, taking the position that (1) the contributions complied with the Election Code and (2) the contributors were not seeking "official action by the County" as defined in the Ethics Ordinance. In an affidavit attached to plaintiffs' motion for summary judgment, Berrios characterized his

rationale for doing so as follows: "[T]hey were operating under a good faith basis that State election law applied, *** the contributions at issue comply with the Election Code, and *** section 2-585(b) of the ordinance did not apply to the contributions at issue." Until the 2018 election cycle, Berrios had returned excess contributions that violated the Ethics Ordinance.

¶ 10     Because the committees did not return the excess contributions before the specified deadline, the Ethics Board sent "Notice[s] of Determination" to Berrios and his committees on January 8, 2018, stating that 41 specified attorneys and law firms who sought "official action" from the assessor made contributions in excess of $750 and thus violated the Ethics Ordinance. The determination notices further stated that the Ethics Board imposed a $1000 fine for each of the 41 violations (for a total of $41,000), a fine of $11,000 jointly against Berrios and the 31st Ward committee, and a fine of $30,000 jointly against Berrios and his own committee.

¶ 11     The plaintiffs sued the Cook County defendants, claiming that certain provisions of the Ethics Ordinance (1) exceeded the county's home rule powers because they were superseded by contrary state law, with the result that the county had no authority whatsoever to regulate campaign contributions to candidates for county office, (2) violated the rights of candidates and citizens under the first amendment to the United States Constitution because they regulate speech and are not closely drawn to a proper legislative purpose, (3) denied candidates and citizens the constitutional right to due process of law under the constitution because the term "official action" is unconstitutionally vague, (4) violated public policy because they infringe on the Illinois Supreme Court's authority to regulate the practice of law and the right of taxpayers to retain counsel of their own choice, and (5) were invalid because only the state's attorney, rather than the Ethics Board, has the power to prosecute violations of county ordinances.

¶ 12    Each these contentions establishes its own separate and distinct claim of unconstitutionality, and each of the two plaintiffs have slightly different claims due to their distinct statuses as candidate and official action-seeker, respectively. Even so, the complaint aggregates their claims all together into a single 79-paragraph narrative that ends with a brief recitation of two counts. *Cf.* 735 ILCS 5/2-603(b) (West 2016) ("Each separate cause of action upon which a separate recovery might be had shall be stated in a separate count ***."). Count I of the complaint seeks a declaratory judgment that the challenged provisions of the Ethics Ordinance are invalid on each of these bases. Count II seeks an injunction against the defendants, prohibiting them from enforcing those provisions.

¶ 13    On February 1, 2018, the circuit court stayed enforcement of the Notices of Violation, pending its decision on the parties' summary judgment motions. The Cook County defendants answered the complaint, denying the substantive allegations and pleading an affirmative defense of *laches* regarding the home rule and first amendment claims.

¶ 14    The parties filed cross-motions for summary judgment. The Cook County defendants supported their motion with the affidavit of Ranjit Hakim, Executive Director of the Ethics Board. Hakim's affidavit explained the Ethics Board's procedures for identifying excessive campaign contributions and its enforcement mechanisms against the contributors and the corresponding campaign committees. Hakim stated that the Ethics Board "has not, and does not intend" to deem anyone who seeks ministerial functions from county officials, such as marriage licenses or picnic permits, as one seeking "official action" under the Ethics Ordinance. He further provided numerous news clippings reporting on decades of alleged "pay-for-play" corruption with respect to the county's property tax assessment process.

¶ 15    The plaintiffs' motion set forth a statement of undisputed facts established by admissions contained in the defendants' answer. The plaintiffs also included an affidavit from Berrios in which he stated that his opponent had donated or loaned more than $800,000 to his own campaign fund, thus lifting the Election Code's contribution caps for the race. Berrios noted that the Ethics Board imposed a $1000 fine for each of 41 excessive contributions. He also stated that he would be filing a request with the Ethics Board to reconsider its decision imposing fines against the 31st ward committee and the Berrios committee and that the fines imposed against those entities and him jointly ($11,000 and $30,000, respectively) were "not part of this action." Berrios concluded that he wished to exercise his first amendment rights to freely associate with the contributors in question and that the Ethics Ordinance prevented a "level playing field *** against a 'millionaire candidate' ".

¶ 16    In his affidavit in support of the plaintiffs' motion for summary judgment, Norris stated that he was an attorney who practiced before the assessor's office to obtain assessment reductions for his clients. He also stated that the Ethics Ordinance "purports" to bar him from contributing more than $750 to Berrios and to the campaigns of other county officials from whom he had no intention to seek official action.

¶ 17    The plaintiffs moved to strike Hakim's affidavit because the facts it set forth were inappropriate in the context of a facial challenge to the Ethics Ordinance. They also contended that the affidavit violated Illinois Supreme Court Rule 191(a) (eff. Jan. 4, 2013) because it contained unsupported legal conclusions and facts outside the personal knowledge of the affiant. The Cook County defendants responded to the motion to strike.

¶ 18    Each side filed responses to the other's motion for summary judgment. These responses elaborated on the parties' positions with respect to the legal issues framed by the complaint. The

Cook County defendants' response contained a second affidavit from Hakim, stating that there had been at least nine prior instances where, in response to a notice of violation, Berrios's committees returned contributions in excess of the $750 limit to particular contributors. The second affidavit also included copies of the relevant correspondence and refund checks.

¶ 19    On March 13, 2018, following argument, the circuit court issued an order, granting summary judgment in favor of the Cook County defendants on both counts of the complaint. The court rejected all of the plaintiffs' challenges, specifically finding that (1) Cook County had home rule authority to enact the Ethics Ordinance, even though the state Election Code also limited campaign contributions, (2) the cap-lifting in the assessor's race did not nullify the contribution limits in the Ethics Ordinance, (3) the Ethics Ordinance was not unconstitutionally vague (noting that "any ambiguity about the meaning of the words 'official action' exist[ ] only at the hypothetical fringes of interpretation" and did not "permeate the text of the Ethics Ordinance"), (4) the contribution limits were a reasonable approach to avoid the appearance of *quid pro quo* corruption and thus did not violate first amendment rights, (5) nothing in the Ethics Ordinance infringed on attorney-client relationships, and (6) the Ethics Ordinance did not infringe on the state's attorney's prosecutorial authority because that office itself also represented the Ethics Board.

¶ 20    The circuit court's summary judgment order did not refer to either of the Hakim affidavits, nor to the pending motion to strike his first affidavit. On March 21, 2018, the court tied up the loose end created by the plaintiffs' then-pending motion to strike the affidavit and denied it as moot. The plaintiffs moved to stay the court's order pending appeal, but the court denied that motion. This appeal followed.

¶ 21    We digress to explain one matter to the parties. Normally, an appeal in this court is not assigned to an authoring justice or panel until briefing has been completed. See Ill. App. Ct., First Dist., R. 2(I)(B) (Sept. 1, 2004). On April 6, 2018, this court entered an order granting the plaintiffs' motion for placement on an accelerated docket pursuant to Illinois Supreme Court Rule 311(b) (eff. July 1, 2017). Under this court's local rule 2(I)(E), when the court grants the motion for accelerated schedule, the accelerated case is immediately assigned to an author and panel even if no briefs have yet been filed. Ill. App. Ct., First Dist., R. 2(I)(E) (Sept. 1, 2004). This exception to the general assignment rule allows the author to begin working on the accelerated case so that the court can promptly issue its decision after the conclusion of briefing and oral argument, if any. Due to administrative exigencies and technical issues, however, this case was not immediately assigned as provided by Local Rule 2(I)(E) when the court granted the Rule 311(b) motion. This court's original accelerated docket order adopted the briefing schedule requested by the parties, which required that the reply brief be filed by June 11, 2018. Briefing concluded when an electronic-filing-compliant reply brief was eventually filed on June 21, 2018, and the case was not assigned to an author and panel until the next group of "ready" cases that were not on an accelerated docket was processed on July 19, 2018.

¶ 22                                ANALYSIS

¶ 23    Summary judgment is appropriate "if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2016). Since the parties filed cross-motions for summary judgment, they conceded that no material questions of fact existed and that only questions of law are involved that the court may decide based on the record. *Pielet v. Pielet*, 2012 IL 112064, ¶ 28. The mere filing of cross-

motions for summary judgment, however, does not establish that there is no issue of material fact, nor is a circuit court obligated to render summary judgment for either party. *Id.* We review the court's decision as to cross-motions for summary judgment *de novo*. *Id.* ¶ 30. Some of the Cook County defendants' arguments in this appeal rely on the Hakim affidavit. However, since the complaint challenges the Ethics Ordinance on a facial basis, we will follow the circuit court's lead and not consider the facts contained in the affidavits in our analysis.

¶ 24     On appeal, the plaintiffs raise three contentions of error: (1) the Ethics Ordinance is unconstitutionally vague, (2) the contribution limits were not narrowly drawn to avoid the appearance of *quid pro quo* corruption and thus violated first amendment rights, and (3) Cook County did not have home rule authority to enact the Ethics Ordinance because the state Election Code's campaign contribution limits preempted that authority. The plaintiffs present no arguments on the other two issues they raised below: (1) that the Ethics Ordinance interferes with the Illinois Supreme Court's authority to regulate the practice of law and (2) that the Ethics Ordinance provides the Ethics Board, rather than the state's attorney, the power to prosecute violations of county ordinances.

¶ 25     Our supreme court has explained:

>        "In construing the validity of a municipal ordinance, the
>        same rules are applied as those which govern the construction of
>        statutes. [Citation.] Statutes are presumed constitutional, and the
>        burden of rebutting that presumption is on the party challenging
>        the validity of the statute to clearly demonstrate a constitutional
>        violation. [Citation.] This court has a duty to uphold the
>        constitutionality of a statute when reasonably possible [citation],

11

and, therefore, if a statute's construction is doubtful, a court will

resolve the doubt in favor of the statute's validity. [Citation.]"

*Napleton v. Village of Hinsdale*, 229 Ill. 2d 296, 306-07 (2008).

¶ 26    The government bears the burden of justifying contribution limits in light of a facial

challenge. *Nixon v. Shrink Missouri Government PAC*, 528 U.S. 377, 387-88 (2000). With those

principles as our backdrop, we consider each of plaintiffs' arguments in turn.

¶ 27                                    Vagueness/Due Process

¶ 28    As their first contention of error, plaintiffs argue that section 2-585(b) of the Ethics

Ordinance is unconstitutionally vague and therefore violates due process. They contend that the

term "official action" is so undefined that it "gives no hint that it applies to lawyers representing

their clients in property tax assessments cases or other quasi-judicial proceedings." For instance,

plaintiffs suggest that the term "official action" could include minor ministerial functions, such

as a county official issuing picnic permits, marriage licenses, or even something as innocuous as

obtaining a photocopy of a county record. They also contend that the Ethics Ordinance's

coverage of "persons" who seek the "official action" does not mention or refer to lawyers who

represent those "persons," leading to a possible construction that the restriction does not apply to

those representing the "persons" in a representational or agency capacity.

¶ 29    In *Wilson v. County of Cook*, 2012 IL 112026, ¶¶ 21-24, our supreme court outlined the

framework for a constitutional vagueness analysis. Vagueness challenges are grounded in the

constitutional principle of due process. *Id.* ¶ 21. The court considers "(1) whether the law fails to

provide people of ordinary intelligence a reasonable opportunity to understand what conduct it

prohibits so that one may act accordingly; and (2) whether the law provides reasonable standards

to law enforcement to ensure against authorizing or even encouraging arbitrary and

discriminatory enforcement." *Id.* (citing *Hill v. Colorado*, 530 U.S. 703, 732 (2000), and *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972)). But it is not necessary that the Ethics Ordinance provide "perfect clarity" or "precise guidance." (Internal quotation marks omitted.) *Id.* ¶ 22 (quoting *United States v. Williams*, 553 U.S. 285, 304 (2008), quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989)). The *Wilson* court also noted:

> "The Constitution tolerates a lesser degree of vagueness in enactments with criminal rather than civil penalties and specifically those without a *scienter* requirement because the consequences of imprecision are more severe. [Citation.] In order to succeed in a facial vagueness challenge, as opposed to an as-applied challenge, the vagueness must 'permeate[ ] the text of such a law.' " *Id.* ¶ 23 (quoting *City of Chicago v. Morales*, 527 U.S. 41, 55 (1999) (opinion of Stevens, J., joined by Souter and Ginsburg, JJ.)) .

¶ 30    The plaintiffs have challenged the Ethics Ordinance on a facial, rather than an as-applied, basis. Therefore, they face an especially difficult burden. "Facial invalidation is, manifestly, strong medicine that has been employed by the court sparingly and only as a last resort." (Internal quotation marks omitted.) *Pooh-Bah Enterprises, Inc. v. County of Cook*, 232 Ill. 2d 463, 473 (2009) (quoting *National Endowment for the Arts v. Finley*, 524 U.S. 569, 580 (1998), quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973)). The fact that a law could be found unconstitutional under some set of circumstances does not establish its facial invalidity. *Napleton*, 229 Ill. 2d at 306.

¶ 31    The plaintiffs' burden is compounded even more, since the Ethics Ordinance does not automatically impose penalties on violators. Instead, the Ethics Ordinance requires that, after receiving a warning, the candidate can return the excess contribution without penalty to the committee, candidate, or donor. The Ethics Ordinance provides as follows:

> "Any candidate for any County office or any current elected official in Cook County government shall return contributions found in excess of the limitations set forth in this Section within 30 days of notification from the Board of Ethics. Failure to return contributions within 30 days shall be a violation of this Section and subject to fines under Section 2-602." Cook County Code of Ordinances § 2-585(f) (approved Oct. 5, 2016).

And while the Ethics Ordinance imposes civil, rather than criminal, penalties, it contains a *scienter* requirement because a fine can only be imposed if one "knowingly" violates it. See Cook County Code of Ordinances § 2-602(d) (approved Oct. 5, 2016).

¶ 32    The test of vagueness applicable here is whether someone, applying common and ordinary meaning to the words, would characterize a particular activity as an "official action" in the context of an ordinance aimed at prohibiting *quid pro quo* impropriety. The normal rules of statutory construction apply to municipal ordinances. *Pooh-Bah Enterprises*, 232 Ill. 2d at 492. The primary rule of statutory construction is to examine its plain language "in light of its common understanding and practice." *Wilson*, 2012 IL 112026, ¶ 24 (citing *Pooh-Bah Enterprises*, 232 Ill. 2d at 492). "If the plain text of the ordinance sets forth clearly perceived boundaries, our inquiry is ended." *Id.*

¶ 33    In support of its contention that the Ethics Ordinance is sufficiently clear, the Cook County defendants provide numerous examples where ethics laws use the term "official action" without further definition, including the gift ban provisions in section 10-10 of the State Officials and Employees Ethics Act (State Ethics Act) (5 ILCS 430/10-10 (West 2016) (barring intentionally soliciting or accepting gifts from any "prohibited source"); see also *id.* § 1-5 (defining "prohibited source" as any person seeking "official action" by a state official)). Local governments such as Cook County must adopt ethics rules at least as stringent as those in the State Ethics Act (*id.* § 70-5(a)), and the attorney general has issued a model ethics ordinance for those governments to adopt. That model ordinance also uses the phrase "seeking official action" without further elaboration. See Ill. Att'y Gen., Model Ethics Ordinance, at 4, http://www.ag.state.il.us/government/model_ethics_ordinance.pdf. Further, federal ethics laws use the term. See 5 U.S.C. § 7353 (2012) (federal gift ban); 5 C.F.R. § 2635.101 (same); 18 U.S.C. § 207 (2012) (federal postemployment restriction). The term is also used, without definition, in the Illinois statute establishing the crime of intimidation. See 720 ILCS 5/12-6(a)(6) (West 2016) (criminalizing acts of a public official who threatens someone that he will "withhold official action" without lawful authority to do so).

¶ 34    Further, the term "official action" has been defined in case law and in legal dictionaries. See, *e.g.*, Black's Law Dictionary 978 (6th ed. 1990) ("official action" defined as "[o]ne done by an officer in his official capacity under color and by virtue of his office"); Ballentine's Law Dictionary 882 (3d ed. 1969) ("official act" defined as "[a]n act done by an officer in his official capacity, under color and by virtue of his office").

¶ 35    These examples are quite helpful in that they illustrate the undefined term "official action" is ubiquitous in ethics laws and is even frequently used in criminal statutes, which

require the highest degree of precision. But in the absence of a definitive precedent addressing whether the term as used in these examples is unconstitutionally vague, they do not definitively resolve the ultimate question before us.

¶ 36     Given the size and complexity of county government, it is not difficult to identify types of action a citizen might seek from a county official that are even more innocuous than even the marriage license and picnic permit examples about which the plaintiffs argue. But an ordinance is not unconstitutionally vague "simply because one can conjure up a hypothetical dispute" over the meaning of a term. *People v. Greco*, 204 Ill. 2d 400, 416 (2003) (citing *Gem Electronics of Monmouth, Inc. v. Department of Revenue*, 183 Ill. 2d 470, 481 (1998)). "In addition to the language used, consideration is given to the legislative objective" and the evil sought to be remedied. *People v. Blackwood*, 131 Ill. App. 3d 1018, 1023 (1985); see also *City of Collinsville v. Seiber*, 82 Ill. App. 3d 719, 725-26 (1980) (rejecting vagueness challenge because the terms in question were "significantly explained in the context of the ordinance as a whole"). The Ethics Ordinance is replete with references to goals such as honesty, avoiding the appearance of impropriety, promoting fiduciary duty, promoting public rather than personal interests, recusal in the case of conflicts of interests, eliminating nepotism, protecting whistleblowers, and financial disclosure. Viewed in that light, the meaning of the term "official action" must be read as applying to action requiring the application of discretion, such that an excessive campaign contribution could be seen as facilitating a *quid pro quo* exchange between the official and the requestor. That being the case, the term "official action" is not unconstitutionally vague.

¶ 37     Cases that strike down enactments as unconstitutionally vague are distinguishable. One example on which plaintiffs rely is *Morales*, which concerned an ordinance prohibiting loitering that was defined as "remain[ing] in any one place with no apparent purpose." (Internal quotation

16

marks omitted.) *Morales*, 527 U.S. at 47 (majority opinion). Indeed, the Court found such a nebulous definition to be constitutionally infirm, noting:

> "It is difficult to imagine how any citizen of the city of Chicago standing in a public place with a group of people would know if he or she had an 'apparent purpose.' If she were talking to another person, would she have an apparent purpose? If she were frequently checking her watch and looking expectantly down the street, would she have an apparent purpose?" *Id.* at 56-57 (opinion of Stevens, J., joined by Souter and Ginsburg, JJ.).

Here, in contrast, the challenged provisions of the Ethics Ordinance, read in proper context, do provide sufficient guidance as to what is prohibited. See *supra* ¶ 32. Mindful of our supreme court's admonitions in *Pooh-Bah Enterprises* and *Wilson* that invalidation of an ordinance for vagueness is "strong medicine" that should not be used except "as a last resort" when vagueness "permeates" the text of the ordinance, we must reject this aspect of the plaintiffs' vagueness challenge.

¶ 38   Plaintiff Norris makes a related argument that the Ethics Ordinance provides not even "a hint" as to whether it restricts activities that he undertakes in a representational capacity, such as when he represents an individual seeking a property tax assessment reduction. He contends that in those cases, it is his client, not he, who is seeking "official action from the County." He notes that since section 2-585(b) of the Ethics Ordinance specifically singles out lawyers who are contracted by the county to work on bond and financial matters and limits their campaign contributions, the absence of a specific reference to lawyers working in other areas suggests that the drafters intended that those lawyers are not subject to the campaign contribution limitations

17

in section 2-585(b). This analogy is inapt. Section 2-585(b) covers a wide range of professionals, not just lawyers. It also includes officers, directors, and partners of any firm contracted by the county to work on bond transactions in nonlegal capacities, such as financial managers. These persons and entities do not seek "official action" *from* the County—they work *for* the County. And singling out bond professionals for campaign contribution regulation is eminently reasonable because their fees can be enormous. See, *e.g.*, Cook County Gov't Bureau of Fin. Official Statement, General Obligation Refunding Bonds, Series 2018, at 6 (Jan. 18, 2018), http://opendocs.cookcountyil.gov/investor-relations/bond-statements/General_Obligation_ Refunding_Bonds_2018.pdf (noting issuance costs of over $800,000 on a $100 million bond issue).

¶ 39    Norris's argument that his clients, not he, are the ones seeking "official action" when the clients hire him to appear before the assessor to seek an assessment reduction fares no better. Our supreme court has explained as follows:

> "[W]hen *** an attorney acts pursuant to the exercise of
> independent professional judgment, he or she acts presumptively
> as an independent contractor whose intentional misconduct may
> generally not be imputed to the client ***. [Citation.] Individuals
> more often than not seek the assistance of an attorney because they
> are unfamiliar with the law and unable to perform the work
> themselves. [Citation.] Therefore, an attorney usually pursues a
> client's legal rights without specific direction from the client, using
> independent professional judgment to determine the manner and

form of the work." *Horwitz v. Holabird & Root*, 212 Ill. 2d 1, 12-13 (2004).

Under this analysis, it is easy to conclude that an attorney retained to seek an assessment reduction for a client is the one seeking "official action" as much, or perhaps more, than the client.

¶ 40    We likewise reject the plaintiffs' arguments that attorneys who are involved in litigation against the state's attorney and seek "official action" from her in the course of representing a client fall within the restrictions of the Ethics Ordinance. They make the same arguments about judges, whom they characterize as county officials. But these arguments are misplaced because both the state's attorney and judges are state, not county, officers. See *Nelson v. Kendall County*, 2014 IL 116303, ¶ 27 (state's attorney is "part of the executive branch of State government"); *Ingemunson v. Hedges*, 133 Ill. 2d 364, 369 (1990) (state's attorney is a state, not county, officer); *Reed v. Kusper*, 154 Ill. 2d 77, 86-87 (1992) (holding that because judges are elected from judicial circuits, not counties, judicial candidates need not be included to form a "complete slate" on a countywide candidates' nomination petition).

¶ 41    Again, we note the plaintiffs are not challenging the Ethics Ordinance on an as-applied basis. We express no opinion on whether the Ethics Ordinance would survive such a challenge if, for instance, the Ethics Board took action against someone who sought innocuous or ministerial "official action" from the county such as a marriage license or copy of a document. In sum, we find that the Ethics Ordinance is not unconstitutionally vague.

¶ 42    *Due Process/Selective Enforcement*

¶ 43    As part of their due process attack against the Ethics Ordinance, the plaintiffs argue that it improperly gives the Ethics Board free rein to single out what it considers to be "high risk"

19

agencies, such as the assessor for special audits to correlate campaign donors and law firms practicing before the agency. They characterize this targeting of particular agencies as the ability to act in a discriminatory and capricious manner by singling out certain officials on a "whim." The relevant allegation in the complaint begins, "Because 'official action' is vague and undefined, section 2-585(b) also results in impermissible selective enforcement of the Ordinance in an arbitrary and discriminatory manner by the Board of Ethics." The complaint then alleges, on information and belief, that the Ethics Board "has not investigated whether any campaign contributions in excess of the limits set forth in section 2-585(b) were made" to county officials other than the assessor. The plaintiffs also raise this argument in response to assertions in the Hakim affidavit explaining how the Ethics Board identifies potential contribution violators and prioritizes its prosecutorial targets. But, as noted above, the plaintiffs make a facial challenge to the Ethics Ordinance and the circuit court did not consider the Hakim affidavit. Nor do we.

¶ 44    But even taking these allegations at face value, we find them to be insufficient to demonstrate a constitutional violation. Prosecutorial resources are not unlimited. No agency, or prosecutor, can possibly prosecute every single offense that might occur in her jurisdiction. Prosecutors have the virtually unrestricted discretion to prioritize as they see fit and select which cases (or types of cases) they will pursue, because "the capacity of prosecutorial discretion to provide individualized justice is 'firmly entrenched in American law.' " *McCleskey v. Kemp*, 481 U.S. 279, 311-12 (1987) (quoting 2 Wayne R. LaFave & Jerold H. Israel, Criminal Procedure § 13.2(a), at 160 (1984)). The appellate court has explained this doctrine and its limitations, as follows:

> "In fact, the exercise of some selectivity in enforcement is a
>
> necessary prerequisite of any modern system of criminal justice.

Nevertheless, prosecutorial discretion is limited by constitutional protections. The State may not deliberately base its decision to prosecute an individual on the constitutionally protected grounds of race, religion, or the exercise of first amendment rights. [Citations.] However, there is a presumption that any prosecution for violation of the criminal law is undertaken in good faith. [Citation.] To overcome this presumption and to justify the holding of an evidentiary hearing, the burden is on the defendant to present sufficient facts to make out at least a *prima facie* case of improper discrimination. [Citation.]" *People v. Lewis*, 73 Ill. App. 3d 361, 364-65 (1979).

Based on these authorities, the Ethics Board may prioritize its prosecutorial focus as it sees fit, so long as it does not do so by choosing its targets based on "constitutionally protected grounds" such as "race, religion, or the exercise of first amendment rights." See *id.* Nothing in the complaint or the record before us shows that the assessor's office was singled out for review because of race, religion, or any other protected ground. It would be entirely reasonable for the Ethics Board to concentrate its efforts, for instance, on candidates for offices such as the assessor, whose discretionary decision-making can result in significant financial gains to taxpayers, rather than on persons whose interactions with county officials are more innocuous and less potentially lucrative. We therefore must reject this aspect of the plaintiffs' claims.

¶ 45                              Freedom of Speech/First Amendment

¶ 46    The plaintiffs contend that the Ethics Ordinance's campaign finance restrictions infringe on their rights to freedom of political expression and association as guaranteed by the first

amendment. In a series of cases, the United States Supreme Court has established a framework that courts use to determine whether a particular restriction is constitutional.

¶ 47    In the first case, *Buckley v. Valeo*, 424 U.S. 1 (1976), the Court examined the constitutional implications of both limits on campaign contributions and on spending. The *Buckley* Court recognized a relationship between political contributions and speech because when a law restricts a candidate's ability to spend money on his campaign, the campaign's message will necessarily reach a smaller audience. But the Court held that contribution limits are subject to a somewhat lenient review because, unlike spending limits, they restrict speech only marginally. Contribution restrictions are upheld if the government can demonstrate that they are "closely drawn" to achieve a "sufficiently important" governmental interest. *Id.* at 25. Protecting elections from corruption is such an interest. *Id.* at 27. The *Buckley* Court upheld the constitutionality of a federal law limiting the amount that individuals could make to candidates for federal office. *Id.* at 35. The Court noted that even though a contribution limit existed, the contributor could still express additional support for a candidate by volunteering and speaking about candidates and issues. *Id.* at 21. In determining whether the contribution limit was "closely drawn," the Court noted that limits that were set at too low of a level could impermissibly impede constitutional rights of contributors and candidates. *Id.* at 82-83. Applying that test, the Court upheld the limit at issue. *Id.* at 29.

¶ 48    In a later case, the Court upheld a state law imposing contribution limits ranging from $275 to $1000 on local and state candidates, again applying the "closely drawn" test and noting that the amount of the limitation "need not be 'fine tun[ed].' " *Nixon*, 528 U.S. at 388 (quoting *Buckley*, 424 U.S. at 30). The key inquiry is whether there is evidence that the limit prevents

candidates from accumulating enough resources for effective advocacy. *Id.* at 397 (citing *Buckley*, 424 U.S. at 21).

¶ 49    In *Randall v. Sorell*, the Court struck down a Vermont law establishing a $400 limit on contributions to local candidates in a two-year cycle because the limit was so low as to not be "narrowly tailored." 548 U.S. 230, 262-62 (2006) (opinion of Breyer, J., joined by Roberts, C.J., and Alito, J.). Unlike the Ethics Ordinance provision at issue here, which only applies to those who seek "official action" from Cook County, the Vermont law applied to all contributors, regardless of their interaction with the governmental body involved.

¶ 50    More recently, in *McCutcheon v. Federal Election Comm'n*, 572 U.S. 185, 220 (2014), the Court struck down a federal limit on aggregate contributions to all campaigns by a single contributor. The *McCutcheon* Court emphasized that the only interest it had found to be legitimate for campaign finance restrictions was the prevention of *quid pro quo* corruption or its appearance. *Id.* at 192. Nonetheless, that interest "may properly be labeled 'compelling' [citation], so that the interest would satisfy even strict scrutiny." *Id.* at 199. This is because the appearance of corruption threatens " 'confidence in the system of representative Government.' " *Buckley*, 424 U.S. at 27 (quoting *United States Civil Service Comm'n v. National Ass'n of Letter Carriers, AFL-CIO*, 413 U.S. 548, 565 (1973)).

¶ 51    The Court of Appeals for the District of Columbia Circuit, sitting *en banc*, unanimously rejected a first amendment challenge to a federal law that barred federal contractors from donating to federal candidates. *Wagner v. Federal Election Comm'n*, 793 F.3d 1, 34 (D.C. Cir. 2015). The *Wagner* court followed the Supreme Court precedents outlined above and found that the contribution bar was permissible in light of the need to prevent corruption and the appearance

of corruption. The court drove home its point by citing a litany of Illinois corruption cases, including those involving former Governors Ryan and Blagojevich. See *id.* at 15-16.

¶ 52    These authorities inexorably lead to the conclusion that the Ethics Ordinance's $750 contribution limit is constitutional. Plaintiffs nonetheless argue that the limit is neither "closely drawn" nor a reasonable fit because of the chronological sequence set forth in the Ethics Ordinance. The Ethics Ordinance limits persons from donating to any county official *after* they have already requested "official action." The plaintiffs contend that the Ethics Ordinance prevents neither the existence of, nor the appearance of, *quid pro quo* corruption because the contributor has already requested the official action and therefore presumably has either obtained the action or had his request for action rejected. We disagree. It is plain to see that an official could certainly grant official action based on the possibility of a *future* contribution. Additionally, one county official's campaign fund may transfer money to another's. 10 ILCS 5/9-1.13 (West 2016). Finally, criminal intent can be found based on a " 'course of conduct of favors and gifts flowing' to a public official in exchange for a pattern of official actions favorable to the donor even though no particular gift or favor is directly connected to any particular official act." (Emphasis omitted.) *United States v. Arthur*, 544 F.2d 730, 734 (4th Cir. 1976) (quoting *United States v. Baggett*, 481 F.2d 114, 115 (4th Cir. 1973)).

¶ 53    Plaintiffs also argue that the Ethics Ordinance is overinclusive in that it prevents someone who requests official action from one county official, such as the assessor, from contributing to another county official, such as the Recorder of Deeds. The circuit court rejected this argument, noting that because "numerous elected County officials work together to administer the real property tax system on behalf of the County, even if the Assessor's role may be outsized," the Ethics Ordinance reasonably limited persons seeking action from one official from contributing

to another. And our supreme court's decision in *Blanchard v. Berrios*, 2016 IL 120315, which we discuss at length later in this opinion, adds further support to this conclusion. The *Blanchard* court rejected Berrios's contention that the county board could not empower an inspector general to investigate Berrios's office, noting that the county board funded the assessor's office and that the board had an interest "in discovering and averting corruption, fraud, waste, mismanagement, unlawful political discrimination, or misconduct in *all* county offices." (Emphasis added.) *Id.* ¶ 33.

¶ 54    Therefore, we reject the plaintiffs' contentions that the Ethics Ordinance violates their first amendment rights.

¶ 55                                    Home Rule Authority

¶ 56    The plaintiffs contend that the Ethics Ordinance is an improper exercise of the county's home rule powers because it infringes on matters over which the state has exclusive control and does not pertain to the county's government and affairs.

¶ 57    Article VII, section 6(a) of the Illinois Constitution designates Cook County as a home rule unit of government and grants it certain powers pertaining to its government and affairs. Ill. Const. 1970, art. VII, § 6(a). The section provides, in part, as follows: "Except as limited by this Section, a home rule unit may exercise any power and perform any function pertaining to its government and affairs including, but not limited to, the power to regulate for the protection of the public health, safety, morals and welfare; to license; to tax; and to incur debt." *Id.* Article VII, section 6(i), governs the interplay between home rule and state authority, and provides in relevant part the following: "Home rule units may exercise and perform concurrently with the State any power or function of a home rule unit to the extent that the General Assembly by law does not specifically limit the concurrent exercise or specifically declare the State's exercise to

25

be exclusive." Ill. Const. 1970, art. VII, § 6(i). Section 7 of the Statute on Statutes (5 ILCS 70/7 (West 2016)) similarly provides as follows: "No law *** denies or limits any power or function of a home rule unit, *** unless there is specific language limiting or denying the power or function and the language specifically sets forth in what manner and to what extent it is a limitation on or denial of the power or function of a home rule unit."

¶ 58    In their preemption argument, plaintiffs concede that the General Assembly has not specifically expressed that it was exercising exclusive control over the area of campaign finance so as to trigger a home rule preemption under article VII, section 6(i). Instead, they rely on case law holding that preemption may be implied by the State's extensive regulation of a particular field because state law is so complete and extensive that the topic is solely part of the *state's* government and affairs as opposed to those of the home rule unit. See, *e.g.*, *City of Chicago v. StubHub, Inc.*, 2011 IL 111127, ¶ 36 (holding that extensive state regulation of auctioneers preempted city's requirement that Internet ticket brokers collect its local ticket tax).

¶ 59    "Whether a particular problem is of statewide rather than local dimension must bedecided not on the basis of a specific formula or listing set forth in the Constitution but with regard for the nature and extent of the problem, the units of government which have the most vital interest in its solution, and the role traditionally played by local and statewide authorities in dealing with it." *Kalodimos v. Village of Morton Grove*, 103 Ill. 2d 483, 501 (1984) (citing *Ampersand, Inc. v. Finley*, 61 Ill. 2d 537, 539-41 (1975), and 7 Record of Proceedings, Sixth Illinois Constitutional Convention 1621-22, 1652-57 (report of the Committee on Local Government)).

¶ 60    In early cases interpreting the home rule provisions of the Illinois Constitution, our supreme court frequently applied the Kalodimos test and upheld local home rule ordinances against challenges that they regulated in areas in which the state had a traditionally exclusive

role. See, *e.g.*, *County of Cook v. John Sexton Contractors Co.*, 75 Ill. 2d 494, 511 (1979) (rejecting  challenge to municipal zoning ordinance); *City of Evanston v. Create, Inc.*, 85 Ill. 2d 101, 112-13 (1981) (rejecting challenge to a municipal landlord-tenant ordinance).

¶ 61    Even in *StubHub*, where the court invalidated a home rule enactment under an implied preemption theory, the court cautioned that the result was an exception to the general rule. To determine if a home rule unit is blocked from legislating in a particular field absent an express preemption, the "threshold" and "narrow" question is whether the subject is one "where the state has a vital interest and a traditionally exclusive role." *StubHub*, 2011 IL 111127, ¶¶ 23, 25 (calling the test "settled law"). The rule is not a " 'free-wheeling' " one, invalidating local measures because of the "mere existence of comprehensive state regulation." *Id.* ¶ 25 (quoting *Kalodimos*, 103 Ill. 2d at 502). The *StubHub* court also stated that implied preemption only applies " 'in the clearest cases of oppression, injustice, or interference by local ordinances with vital state policies.' " *Id.* ¶ 22 (quoting David C. Baum, *A Tentative Survey of Illinois Home Rule (Part I): Powers and Limitations*, 1972 U. Ill. L.F. 137, 156-57 (1972)). "That is, because the legislature can always vindicate state interests by express preemption, only vital state interests would allow a court to decide that an exercise of home rule power does not pertain to local government and affairs." *Id.* (citing David C. Baum, *A Tentative Survey of Illinois Home Rule (Part II): Legislative Control, Transition Problems, and Intergovernmental Conflict*, 1972 U. Ill. L.F. 559, 573 (1972)).

¶ 62    Before *StubHub*, the supreme court had consistently refused to strike down home rule measures based on implied preemption, stating: "We decline to depart from historical precedent and adopt an implied preemption doctrine of home rule authority in Illinois." *Village of Bolingbrook v. Citizens Utilities Co. of Illinois*, 158 Ill. 2d 133, 142 (1994). In his *StubHub*

dissent, Justice Thomas noted that *StubHub* "marks the *only* time in this court's history that this court has ever invalidated an ordinance under section 6(a) solely on the basis of state regulation." (Emphasis in original.) *StubHub*, 2011 IL 111127, ¶ 71 (Thomas, J., dissenting). Nonetheless, we are bound to follow *StubHub*, and we will examine plaintiffs' arguments in light of not only *StubHub*, but also of the case law following it.

¶ 63     A few years after it issued the *StubHub* decision, our supreme court revisited the issue of local preemption in *Palm v. 2800 Lake Shore Drive Condominium Ass'n*, 2013 IL 110505. *Palm* involved a Chicago ordinance that, among other things, required condominium boards to provide documents to owners within 3 days even though state law allowed the boards to provide them within 30 days. *Id.* ¶ 23. In *Palm*, the court again emphasized that a home rule enactment is invalid only if it conflicts with state law to such an extent that the two cannot logically remain in force simultaneously. *Id.* ¶ 42. And "[u]nder section 6(i), home rule units may continue to regulate activities even if the state has also regulated those activities." *Id.* ¶ 32. In fact, nothing in Illinois's home rule jurisprudence conceptually prohibits a home rule unit from regulating a particular type of human conduct *more* strictly than the state. For example, both the state and home rule unit can tax the same product, with the result that the sale is subject to both taxes. See *Mulligan v. Dunne*, 61 Ill. 2d 544, 551 (1975) (upholding concurrent state and county liquor taxes).

¶ 64     The *Palm* court rejected the condominium board's argument that the Chicago ordinance was irreconcilable with state law, stating that "A more restrictive ordinance leaves the statute intact and enforceable." *Palm*, 2013 IL 110505, ¶ 39. This mirrors the situation before us. The Election Code limits contributions to $5600, but the Ethics Ordinance limits them, in some circumstances, to $750. The Ethics Ordinance is "more restrictive" than the Election Code, but

the ultimate result is that the lower limit governs within Cook County. Since Cook County's

limit is *lower* than the State's, a candidate who complies with both limits, as he must, can do so

without running afoul of either. Plaintiffs nonetheless argue that because the General Assembly

has specifically enacted limits on campaign contributions, the state has staked out an exclusive

role for itself in that area. Again, we disagree. Cook County, exercising its home rule authority,

has simply taken the concept of campaign contribution limitations established in article 9 of the

Election Code and made it stricter.

¶ 65    The plaintiffs characterize the Ethics Ordinance provisions as only dealing with elections,

and they also contend that state law establishes a comprehensive scheme, giving the state

exclusive control over all matters concerning elections. They rely on article III, section 4, of the

Illinois Constitution, which requires that "[l]aws governing voter registration and conduct of

elections shall be general and uniform" (Ill. Const. 1970, art. III, § 4), and section 5 of that

article, which vests the State Board of Elections with "general supervision over the

administration of the registration and election laws throughout the State" (Ill. Const. 1970, art.

III, § 5). These clauses, plaintiffs suggest, demonstrate that election regulation is exclusively

reserved to the state and foreclose the ability of a home rule unit to regulate campaign finance.

But the mechanics of running elections—registering voters, scheduling election dates,

administering polling places—are one thing. Running for office in the campaign arena is another

entirely. Like the need to guard against the appearance of *quid pro quo* corruption, it is

quintessentially local in character. The supreme court has rejected the notion that the uniform

election clause in section 4 of article III precludes home rule units from enacting election-related

regulations. Upholding a local measure to hold nonpartisan elections for municipal officers, the

court held that section 4 "is concerned with registration and the mechanical procedures for

holding elections, not with the partisan or nonpartisan nature of the election, which more closely concerns the manner of selecting officers." *Boytor v. City of Aurora*, 81 Ill. 2d 308, 315 (1980) (citing 7 Record of Proceedings, Sixth Illinois Constitutional Convention 2343-60 (report of the Committee on Suffrage and Constitution Amending)). Like the *Boytor* court, we reject the notion that the challenged ordinance deals with election "registration and mechanical procedures" exclusively governed by the Election Code. Accordingly, we agree with the circuit court's finding that "[l]ocal governmental units, therefore, may enact their own laws governing campaign finance for local elections so long as they do not touch voter registration or the mechanical procedures for holding elections."

¶ 66    Another recent case from our supreme court illustrates why the county's action is well within its home rule powers. In *Blanchard*, 2016 IL 120315, the court considered a case brought by the Cook County Inspector General (IG) after Assessor Berrios refused to cooperate with an IG investigation on the basis that the county's home rule powers did not extend to the ability to grant the IG authority to investigate a separate countywide elected official following the county's enactment of the "IG Ordinance." *Id.* ¶¶ 3, 7 (citing Cook County Code of Ordinances § 2-281 *et seq.* (approved July 31, 2007)). Among other things, he contended that the Property Tax Code (35 ILCS 200/1-1 *et seq.* (West 2014)) demonstrated state preemption in the area of property tax assessment administration. *Blanchard*, 2016 IL 120315, ¶ 35. That argument parallels the argument Berrios makes here that the state Election Code preempts the county Ethics Ordinance.

¶ 67    The *Blanchard* court rejected Berrios's position. After reciting the stated goals of the IG Ordinance, which were to "detect, deter and prevent corruption, fraud, waste, mismanagement, unlawful political discrimination or misconduct in the operation of County government," the *Blanchard* court held that "it is clear that Cook County has an interest in discovering and

*averting corruption*, fraud, waste, mismanagement, unlawful political discrimination, or misconduct *in all county offices*." (Emphases added and internal quotation marks omitted.) *Id.* ¶¶ 32-33. The court further stated, "Preserving the integrity and efficient operation of its offices is a charge that lies with the county and the Board, as manager of all county business. The IG Ordinance provides the county with the means of addressing possible corruption, fraud, and other specified types of malfeasance within its offices." *Id.* ¶ 33. Therefore, the *Blanchard* court held that the "achievement of this goal falls within the police power granted to home rule units 'to regulate for the protection of the public health, safety, morals and welfare' " under the home rule provision of the Illinois Constitution. *Id.* ¶ 32 (quoting Ill. Const. 1970, art. VII, § 6(a)).

¶ 68 The *Blanchard* court also rejected Berrios's argument that an implied preemption precluded Cook County from investigating his office. The court explained that

> "[t]he Assessor has not pointed to any statutory provisions that reflect a statewide interest in detecting corruption and fraud in county offices. As noted above, Cook County has the most vital interest in preserving the integrity and efficient operation of its offices. The IG Ordinance furthers that interest by allowing the Inspector General to investigate possible corruption, fraud, and other types of malfeasance." *Id.* ¶ 35.

This analysis is equally apt here, since the stated purpose of the Ethics Ordinance includes the precise types of interests that the *Blanchard* court found were properly within the county's home rule powers to address as matters pertaining to the county's "government and affairs."

¶ 69 Adding further support to the county's position that the Ethics Ordinance is valid is the State Ethics Act, which strictly prohibits state officials from receiving certain gifts from persons

seeking "official action" from them. 5 ILCS 430/1-5, 10-10 (West 2016).[2] While the State Ethics Act does not directly regulate the *amount* of campaign contributions, it does prohibit state officials from soliciting or receiving campaign contributions at certain times and locations, characterizing them as "prohibited political activities." *Id.* §§ 1-5, 5-15. Section 70-5(a) of the State Ethics Act mandates that all units of local government, including Cook County, "adopt an ordinance or resolution that regulates, in a manner no less restrictive than Section 5-15 and Article 10 of this Act, *** the political activities of officers and employees of the governmental entity." *Id.* § 70-5(a). The State Ethics Act requires local governments, whether they are home rule or not, to adopt ordinances that regulate political activities "*in a manner* [*that is*] *no less restrictive*." (Emphasis added.) *Id.* This significantly undermines plaintiffs' argument that the state has staked out an exclusive claim to regulate in the field of campaign contributions. See also Ill. Att'y Gen., A Guide to the Implementation of the Model Ethics Ordinance, at 5, http://www.ag.state.il.us/government/ethics_ordinance_guide.pdf (stating "it is clear that the [State Ethics Act] is intended to provide Governmental Entities with all of the power necessary to effectuate the General Assembly's purposes"). It also at least suggests that even non-home-rule units may have authority to regulate campaign finance in the same manner as the Ethics Ordinance.

¶ 70    Accordingly, the circuit court correctly held that the Ethics Ordinance was not an improper exercise of the county's home rule powers.

---

[2] We note that the State Ethics Act, like the Ethics Ordinance, contains no definition of "official action," which also supports our conclusion that the term is not so abstruse that it is unconstitutionally vague.

¶ 71                                    Self-Funding Candidates

¶ 72    Section 9-8.5(h) of the Election Code "lifts the caps" imposed by section 9-8.5(b) in races where a candidate or family member has donated more than $100,000 to the candidate's campaign. 10 ILCS 5/9-8.5(h) (West 2016). In those races, the non-self-funding candidate is no longer subject to the $5600 contribution limit. The plaintiffs argue that the $750 limit in section 2-585(b) of the Ethics Ordinance "revoke[s]" this benefit to non-self-funding candidates and thus impermissibly conflicts with state law. Cook County argues that the plaintiffs waived this argument because they conceded the point below. Waiver aside, the plaintiffs' argument is without merit. The two provisions do not conflict with each other. Section 9-8.5(h) provides that when the State Board of Elections posts a notice of self-funding on its website, "all candidates for that office, including the public official or candidate who filed a Notification of Self-funding, shall be permitted to accept contributions in excess of any contribution limits *imposed by subsection (b)*." (Emphasis added.)  The cap-lifting provision in section 9-8.5(h) of the Election Code thus refers only to the *state* limits imposed by section 9-8.5(b) and does not affect any locally imposed limits.

¶ 73    Therefore, we must reject plaintiffs' arguments that the Ethics Ordinance is flawed because another candidate in Berrios's race was a "self-funding" candidate whose contributions to his own campaign "lifted the caps" in the subject race.

¶ 74    We note that the plaintiffs have made no argument that the fines the Ethics Board imposed are excessive, nor that the facts as determined by the Ethics Board were incorrect or unsupported by competent evidence. While the complaint mentions the Ethics Board charges and the manner in which the board resolved them, the plaintiffs only requested a declaratory judgment that the Ethics Ordinance is unconstitutional and an injunction against its enforcement.

The plaintiffs state that they have challenged the Ethics Board's final rulings in a separate administrative review proceeding.

¶ 75                                    CONCLUSION

¶ 76    For these reasons, we affirm the judgment of the circuit court.

¶ 77    Affirmed.